GARRETT, J.
1 ]The defendant, Gary Lewis Walker, was convicted by a unanimous jury of the second degree murder of Francois Davis. Walker was ordered to serye the mandato *956 ry sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Walker appeals. For the following reasons, we affirm the conviction and sentence.
FACTS
Walker and Davis met through a chat line in 2004, and began a relationship in March 2013. Davis frequently stayed with Walker in his mobile home in- the KCS subdivision in Mansfield, Louisiana. Walker’s mother, Lula Benefield, lived next door. On March 10, 2015, Walker’s truck did not leave the residence. That evening, Walker was found trying to break into houses in the subdivision and behaving erratically. He was wearing boxer shorts, a T-shirt, and a hoodie. Walker was scratched and bleeding from cuts sustained on fences in the area. Benefield was contacted and went to a field where Walker had been subdued and was lying face down, handcuffed. Benefield said Walker appeared to be impaired and did not recognize her.
Walker was taken to a hospital and Benefield went to Walker’s residence to get him some clothes. She was accompanied by her husband, her son, Tremayne, and her daughter. The front door of the residence was jammed, but a window was open. Benefield called out, but received no response from anyone in the residence. Tremayne entered the dwelling through the open window and was eventually able to open the front door, which was jammed. Benefield entered with her husband and daughter, and | ¿went to a bedroom to get Walker’s clothes. She saw Davis lying in bed and called out to him several times, but got no response. Benefield walked around the bed to look at Davis. Davis had been shot in the head and was dead. Bene-field said when she saw him, she fled and alerted law enforcement officers.
Walker was questioned and gave several statements. Although he never admitted that he shot Davis, law enforcement officers determined that Walker committed the homicide. On April 9,2015, Walker was indicted by a grand jury for the second degree murder of Davis. In May 2016, he was tried by a jury and was unanimously convicted as charged. Walker was ordered to serve the mandatory sentence for second degree murder, life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence.
Walker appealed. Appellate counsel argues there was insufficient evidence to support the conviction. Walker also filed a pro se brief, arguing that he was denied a “fundamentally fair trial” because a prosecution witness was compelled to give prejudicial testimony after the witness invoked his Fifth Amendment privilege and his Sixth Amendment right to counsel. Walker also urges that he was denied his Sixth Amendment right to conflict-free counsel because his counsel had to cross-examine a prosecution witness that counsel had represented in a previous case.
SUFFICIENCY OF THE EVIDENCE
Walker argues that the state failed to present sufficient evidence to support the verdict of second degree murder. This argument is without merit.
IsLegal Principles
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, ahy rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La. 5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Sullivan, 51,- *957 180 (La.App. 2 Cir. 2/15/17), 216 So.3d 175, 2017 WL 604990. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own -appreciation of the evidence for that of the factfinder. State v. Pigford, 2005-0477 (La. 2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La. App. 2 Cir. 1/14/09), 1 So.3d 833, writ denied, 2009-0310 (La. 11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 1994-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to the factfinder’s decision to accept or reject the testimony of a witness in whole or in part. State v. Sullivan, supra.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable |4doubt that the defendant was guilty of every essential element of the crime. State v. Sullivan, supra; State v. Cortez, 48,319 (La.App. 2 Cir. 8/7/13), 122 So.3d 588.
La. R.S. 15:438 states:
The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.
When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant’s own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Captville, 448 So.2d 676 (La. 1984); State v. Matthews, 50,838 (La.App. 2 Cir. 8/10/16), 200 So.3d 895.
When a jury reasonably and rationally rejects the exculpatory hypothesis of innocence offered by a defendant’s own testimony, an appellate court’s task in reviewing the sufficiency of the evidence under the Due Process Clause is at an end unless an alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Calloway, 2007-2306 (La. 1/21/09), 1 So.3d 417; State v. Matthews, supra.
Circumstantial evidence is defined as evidence of facts or circumstances from which one might infer or conclude the existence of other connected facts. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Matthews, supra.
1 ^Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1. Specific intent is the state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); State v. Davis, 40,382 (La.App. 2 Cir. 10/26/05), 914 So.2d 1129, writ denied, 2005-2419 (La. 4/17/06), 926 So.2d 512. As a state of mind, specific intent need not be proved as a fact; it may be inferred from the circumstances and the actions of the defendant. State v. Mickelson, 2012-2539 (La. 9/3/14), 149 So.3d 178; State v. Davis, supra. The discharge of a firearm at close range and *958 aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Lloyd, 48,914 (La.App. 2 Cir. 1/14/15), 161 So.3d 879, writ denied, 2015-0307 (La. 11/30/15), 184 So.3d 33, cert. denied, — U.S. -, 137 S.Ct. 227, 196 L.Ed.2d 175 (2016). The determination of whether the requisite intent is present is a question for the trier of fact. State v. Huizar, 414 So.2d 741 (La. 1982); State v. Lloyd, supra.
Discussion
Both the state and the defense presented testimony from numerous witnesses. Further, more than 80 exhibits were introduced into evidence. The jury was presented with the following evidence and testimony.
Brittany Toussaint, a cousin of Davis’s, testified that, shortly before his death, Davis had started a new job in Shreveport. Toussaint said that Davis was the “life of our family” and was .greatly missed.
|fiJohnny Davis, the victim’s father, testified that his son had been living with him in Shreveport immediately prior to his death and that he had been transporting him to his new job. Mr. Davis had never met Walker.
Patricia Montgomery, an agent for an insurance company, testified that she goes into the field to collect premiums from clients. On March 10, 2015, she went to Walker’s home between 2:00 and 3:00 p.m. to collect a payment, She called his telephone number and did not get an answer. No one answered when she knocked on the door. Walker’s truck was at the residence. Montgomery went next door and talked to Walker’s mother. When she left 30 minutes later, Walker’s truck was still at the residence.
.Corporal Jason Ambrose of the Mansfield Police Department testified that, on March 10, 2015, he responded to a call about a suspicious person trying to break into houses in the KCS subdivision. He and several other officers made contact with Walker at the scene. He described Walker as “kind of incoherent.” Walker was wearing a shirt and torn boxer shorts. Ambrose did not detect the odor of alcohol. Walker was injured from jumping fences. The officers determined that the DeSoto Parish Sheriffs Office (“DPSO”) had jurisdiction over the matter. They were able to get Walker to lie still and they called emergency medical services. Ambrose could not remember the time of day the incident occurred, but stated that it was after dark.
Corporal Luther Butler of the DPSO responded to the call by Ambrose. He went to the area where Walker was subdued and spoke with a homeowner who identified Walker as the person who was prowling through the neighborhood. Walker had been taken to the hospital. ■ Butler went to the hospital, advised Walker of his Miranda rights, and questioned him about 17running through the neighborhood. Walker said something about a friend named “T.J.” and looked off at the wall. Butler asked Walker about what happened at his residence and Walker said he and his friend had gotten into an argument. When Walker was released from the hospital that night, Butler transported him to the DPSO.
Benefield, Walker’s mother, confirmed that Montgomery, the insurance agent, had been at her house that afternoon. She also testified that she heard a car at Walker’s residence pull away rapidly about 6:00 p.m. Benefield testified that, later that day, she went to the location where Walker was detained for attempting to break into houses. He was handcuffed in a field and did not recognize her. Benefield went to the hospital and then went to Walker’s *959 house to get him some clothes. A window to the residence was open and the door was jammed. Her son, Tremayne, entered through the window and eventually was able to open the front door. Benefield went to a bedroom and saw Davis in bed, covered up. She called his name several times, and he did not respond. She walked around the bed, saw Davis, and ran out and called 911.
On the date of the incident, Corporal Casey Hicks of the DPSO responded to a call about an unresponsive male covered in blood in a residence at the KCS subdivision. The residence was Walker’s mobile home. Hicks found Davis inside, in bed, dead from a gunshot wound to the head. Approximately 10 people were standing outside the house.
Sergeant Jordan Ebarb of the DPSO testified that he investigated the homicide. He arrived at Walker’s residence at 10:12 p.m. on March 10, 2015, He photographed the scene, returned the next day, and took more photographs. Numerous photographs were admitted into evidence. There | «were no tool marks on the open window and there was a cardboard box near the window which had blood on it that was determined to be Walker’s. A wallet belonging to Davis was found in the house, along with two cell phones. An empty .380 shell casing was found in the bedroom where the victim’s body was found. No projectile was recovered. A box of Remington bullets was also found in the room. Walker’s name was written on the box. Sixteen bullets were missing from the box. An empty 9 mm magazine was found in the room. No firearm was found at the scene. There was no sign of a struggle in the residence, and there was no evidence that anyone had been in the house other than Walker and Davis.
Walker’s hands were tested for gunshot residue and the.test.result was negative. Ebarb noted that Davis had been dead for several hours before Walker’s hands were tested. Ebarb stated that Walker could have washed his hands or he could have sweated. Ebarb also observed that Walker was found in a wet field.
Lieutenant Billy Locke of the DeSoto Parish Coroner’s Office investigated the case. He made photographs of the scene and prepared the body for transport to Caddo Parish for an autopsy. He photographed a shell casing lying on the floor next to the bed. He also.photographed the gunshot wound to the back of the victim’s head and the body after Davis was turned over. Locke identified the death certificate issued for Davis, which listed the cause of death as a single gunshot wound to the head “by other,”
John Cobb, now a retired lieutenant from the DPSO, testified that he was working the night Walker was brought to the DPSO froto the hospital. Walker was ' advised of his Miranda rights. He had cuts on his legs and hands, which Cobb understood were caused by jumping over fences. UWalker was able to give his date of birth and address, but seemed to have some difficulty doing só. He said that he lived by himself, 'but later told Cobb that he had an argument with Davis, who lived with him. Walker stated that he thought Davis was “fooling around” on him. Walker was slow to respond. to questions.. Cobb thought that Walker was able to respond, but chose not to answer correctly. Although he had encountered subjects in the past who were not competent to give information, in this case he felt that Walker was competent, but was trying to conceal information. Walker did not give any information as to the. condition of Davis when Walker left the house.
. Sergeant Shawn.Parker of the DPSO was present for three post-arrest interviews with Walker. Walker ¡admitted hav *960 ing an argument with Davis. He was asked if they fought and the gun discharged. Walker denied that. Walker was asked where the gun was and he said he did not know. According to Parker, Walker said he bought a gun at a pawn shop in 2003. When Walker gave no information about the current location of the gun, the officers decided to terminate the interview and allow Walker to get some sleep.
Walker was interviewed again the next morning. Parker testified that Walker said Davis was his boyfriend and lived with him. Walker described going with Davis to the home of Davis’s mother and she was giving Davis a hard time for not having a job. Walker claimed he had been supporting Davis for a year and a half. Walker worked at Mansfield Auto World and said that Davis accused him of telling people at work that Davis had relationships with both men and women. Walker claimed Davis was upset that Walker went to the home of a former teacher. Walker said that Davis 11flwas angry that Walker infected him with HIV, and they had a fist fight over it. Parker testified that Walker had bruises and cuts on his hands consistent with fighting. Walker also said that Davis told him he had been having sex in the house when Walker was not at home.
Walker stated that he kept a gun on a shelf in the bedroom, but the gun was now probably in the landfill. On the day Davis was found dead, Walker said they were at home all day. When asked who shot Davis, Walker said he did not know.
In another interview, Walker told Parker that, on the day Davis died, they had been in bed and the last time he saw Davis, he was asleep. He denied being in the house when Davis was shot and said he was “peeping out the door.” Walker was asked if he did not kill Davis, who did. Walker responded he did not know, because Davis had so many friends. When asked who would want to hurt Davis, Walker replied that Davis owed money.
Walker said at one point he shook Davis and “he was still there” and there was no blood. He stated he grabbed the victim’s wrists and heard him snoring. Parker asked if Walker was sorry for what he did and he stated that he had nothing to be sorry for. Parker asked Walker how it was to see Davis in bed after he had been shot with all that blood, and Walker said it was rough.
Parker was advised that the homicide possibly occurred around noon, putting Walker in the house after the shooting for 10 to 12 hours. Parker stated that Walker did not always give responsive answers to questions, but he did not consider that Walker was impaired. Parker thought Walker was being evasive.
InDuring the testimony of Ebarb, he identified a recording of a telephone conversation between a woman, believed to be Benefield, and Walker, which occurred on March 29, 2015, while Walker was in jail. The woman stated that she was going to try to catch up with Earl Montgomery and said, “That gun, I don’t [know] what he do to it. It probably in the trash there somewhere. He probably sell it to someone.” She also asked Walker if he had just bought the gun. He responded that he had it for a little while. Discussion of the gun ended when it appeared Walker perceived that people in the jail may have been listening to the conversation.
Jarred Jackson, an inmate who was incarcerated at the same time as Walker, was called to testify. As will be discussed more thoroughly below, Jackson was a reluctant witness who stated that he did not want to be in court and did not want to testify. Jackson had recently pled guilty to armed robbery and had been sentenced to serve 25 years at hard labor. While in jail, *961 prior to his guilty plea, Jackson gave a note to the jailers asking to speak to the investigators in this case. He claimed that Walker had confessed to him that he killed Davis. The note was introduced into evidence. Jackson admitted that he gave a statement to investigators that Walker told him Davis was his boyfriend and that he shot him in the head with a handgun.
Several items were collected from the scene and sent to the North Louisiana Criminalistics Laboratory in Shreveport (“Crime Lab”) for analysis. Doctor Jessica Esparza, an expert in DNA analysis at the Crime Lab, testified regarding analysis of those items. She analyzed a hoodie, T-shirt, boxer shorts, and a cardboard box with blood. It was determined that only Walker’s blood was on those items. A pair of jeans was analyzed that did not contain blood. The DNA on the jeans belonged to Walker.
|12Pr. James Traylor, director of autopsies and forensic services at the Louisiana State University Health Sciences Center in Shreveport, performed the autopsy on Davis. He began the autopsy at 6:35 a.m. on March 11, 2015, and determined that Davis had been dead 24-36 hours. He had a near-contact gunshot wound that entered the back of the head and exited the front of the head through the right eye. He estimated that the gun was one to one and one-half inches from the victim’s skin when it was fired. There was blood in the tra-cheobronchial tree and the stomach, indicating that the victim was conscious enough to swallow after the wound was inflicted. However, there was no deep aspiration of blood. Traylor stated that it was possible that Davis could have moved slightly after the wound was inflicted. The toxicology report showed that the only substance in the victim’s blood stream was cotinine, which is metabolized from nicotine.
Lieutenant Owen McDonnell, Jr., a retired crime scene investigator with the Caddo Parish Sheriffs Office, now operates a private consulting firm, M. 0. Forensics. He testified as an expert in crime scene reconstruction and analysis. He did a crime scene analysis and prepared a report in this case. He stated that Davis was lying face down on a pillow at the time he was shot. The shooter was standing at the foot of the bed on the left side or leaning across the bed to achieve the angle of the gunshot wound. The projectile was not recovered. The blood patterns showed that Davis moved slightly after he was shot. There was no way to tell if the shell casing found at the scene came from the box of bullets found in the room, but it was the same brand, caliber, and color as the bullets in the box.
At that point, the state rested, and the defense presented its case. Benefield, Walker’s mother, was questioned about the recorded telephone hscall while Walker was in jail, in which the location of the gun was discussed. She denied having such a conversation with Walker. She said she lived next door to Walker and never observed any trouble between Walker and Davis.
Sharon Belton, a resident of the KCS subdivision, testified that she usually goes to bed around 8:30 to 9:00 p.m. She usually looks out her door before going to bed. On the evening of March 10, 2015, when she looked out, she saw a man run out of the carport at her neighbor’s house next door. The man, who was later identified as Walker, was walking erratically, like he was drunk or high. He started to enter her yard and Belton grabbed a pistol and told him not to come in. Walker turned and went across the street and climbed over a fence. She alerted her neighbors and thought some of her neighbors called the police. Belton was worried that he might *962 be shot and killed due to his erratic behavior. She saw Walker by her back fence, caught hold of his hood, and “I just set to beating him with'my .gun.” She thought that if she could subdue Walker until the police arrived, they "could do something with him.” Walker broke away and jumped Belton’s- back fence. In about 15 minutes, the city police asked Belton to come to a field where they had subdued Walker in order to determine if he was the person she saw in her neighborhood. She identified Walker as the person she saw earlier. She then heard sirens and got a call from a neighbor that someone had been found dead at what they thought was Benefield’s residence. The police returned later and asked Belton if Walker had a gun when she saw him. She said she did not see a gun. She also said she thought she saw something shiny, but it could have been a light reflection.
Nicholas Thomas knew Walker from the neighborhood and saw him on the evening of March 10, 2015, when he was running through the ^neighborhood. Thomas said, that Walker was wearing a jacket, shorts, and a shoe. Walker was not himself and was behaving like his mind was gone. He stated that Walker smelled like cocaine. Thomas tried to hold Walker, but he got away, Thomas saw Walker being taken away in an ambulance.
Keith Thomas testified that he and Walker had been friends for more than 30 years and worked together at Mansfield Auto World. He met Davis through Walker. He stated that he only found out the two were involved with each other after the fact.
Tremayne Walker, the defendant’s brother, testified about going to the defendant’s house on March 10, 2015, and entering the house, through a window. He did not see a gun in the house.. He stated that his brother did not have a reputation for being angry, and he had never known his brother and Davis to have fist fights.
Jennifer White, Walker’s cousin, testified that she never observed Walker being jealous of'Davis. She claimed that Walker told her Davis was HIV positive in 2013, but she was not aware that Walker was also HIV positive.
William Thomas, who was in a relationship with Walker’s sister, had never seen Walker seem jealous about Davis. However, he claimed that Davis was jealous of Walker.
Against the advice of his counsel, Walker testified in his own defense. He stated he became acquainted with Davis through a chat line in 2004. They met in person in January 2013, and became a couple in March 2013, Walker stated that he is HIV positive and he told Davis about his condition in 2013, when they got together. Walker outlined various jobs that Davis had.
hflOn the day Davis was shot, Walker said he woke up and Davis was in the living room using a cell phone to check on an income tax refund. Walker went back to bed. Walker said there was a knock on the door which Davis answered and when he came back he smelled of cigarette smoke.
Around 2:00 p.m., Walker woke Davis up to go to work. Davis said he was not going back to that job. Davis wanted the couple to leave Louisiana. Walker told Davis that Dallas was as far away as he would-go. Walker said he heard another knock at the door and two men were standing there asking for Davis. The men came into the house and started arguing and tussling with Davis. He said Davis fell on the bed and there was a pop. Walker claimed he tried to run, but the men were at the front door. Walker said one of the men caught him and pushed him down on the floor and asked where the money was. Walker point *963 ed to some money on the-kitchen table he claimed was part of Davis’s tax refund. One of the men asked where the dope was; Walker gave them drugs that were under the bed.
Walker claimed that the men were going to kill him and planned to tie him up and burn the house down. He’ said they forced him to swallow a bunch of pills. Then they took him to a back room and'tied his hands. According to Walker, one of the men left, but the other remained and was watching him. Walker claimed he then lost consciousness. He did not remember running through the neighborhood later that evening, being taken to the hospital, or being interviewed by law enforcement. He testified that his earliest memory was looking at a square hole in a wall and faces were coming out of it.
. On cross-examination, Walker said that he began to remember this chain of events when he came out of a holding cell in jail when he was 11flinitially arrested. When asked why he never told this story in any of the interviews with law enforcement, he said that his attorney told him not to say anything because his words would be twisted.
When asked about the specifics of his story, Walker said that, ■ when the men came into the house, Davis reached for a gun he kept under a pillow and there was a tussle. He insisted that Davis was shot with his own gun. He stated that Davis was a drug dealer and knew that someone was after him, so he had the gun for protection. Walker said that he kept a gun on a shelf, but denied that the box of bullets on the shelf with his name on fit belonged to him.
Walker was asked about Jackson’s statement that Walker admitted killing Davis. He said that Jackson was a snitch and was trying to build a case against him. Walker was asked how Jackson knew the specifics of the murder, such as where the body was found, where Davis’s mother lived, that Davis was shot with a .380 handgun, that-a 9 mm magazine was found in the residence, and that a window was open at the residence. Walker responded that people on the street knew that information. Walker denied confessing to Jackson that he killed Davis.
Walker was questioned about the telephone' conversation from jail with his mother 'in which they' discussed a gun. Walker said they did not say “gun.” He insisted they were talking about a dryer.
The evidence presented at trial was sufficient to prove that Walker-killed Davis. Davis was shot in the back of the head at close range while he slept. A .380 shell casing was found at the scene and Walker had a box of .380 -bullets in the room. The shell casing was -the same brand, caliber, and color as the bullets in the box. Walker’s name was written on the. box. He |17aIso admitted having a gun, which was not found at the scene. Walker told deputies that the gun might be in- a landfill. While in jail, Walker talked' on the telephone to a woman believed to be his mother about the location of a gun. The gist of the conversation was that the gun had been thrown away. Walker admitted having a fistfight with Davis and believed that Davis was “fooling around” on him. There was also some dispute about exactly when Walker had told - Davis he was HIV positive. Walker told officers shortly after his arrest that, Davis was upset that Walker infected him with HIV and they had a fistfight over it. Walker was alone in the residence with Davis the entire day that the murder occurred.
Although Walker offered a fanciful tale about Davis being a drug dealer-and insisted that he was killed by two unknown assailants who stole money and drugs, the *964 physical evidence did not support the story. Walker insisted Davis struggled with the assailants and was shot with his own gun that he kept under his pillow. Walker claimed this struggle occurred in the bedroom and on the bed. However, the photographs introduced into evidence showed no sign of a struggle. Instead, Davis’s body was covered up to the chest with a blanket, and it appeared he was sleeping when he was shot. There was no evidence that any other people had been in the residence on the day prior to the murder. Simply put, Walker’s explanation at trial as to what occurred was completely incredible, internally inconsistent, and completely at odds with the physical evidence. The jury’s decision to reject Walker’s self-serving testimony was a credibility call and entitled to great deference. The jury reasonably rejected the hypothesis of innocence presented by Walker’s testimony and no alternative hypothesis was sufficiently reasonable that a rational juror could not have found proof of |1sguilt beyond a reasonable doubt. Viewing the evidence in the light most favorable to the prosecution, the jury had sufficient evidence to prove, beyond a reasonable doubt, that Walker committed all the elements of the offense of second degree murder of Davis. The jury did not err in finding Walker guilty as charged.
RIGHTS OF WITNESS
In his pro se brief, Walker contends that he was denied a fair trial when a prosecution witness was compelled to give prejudicial testimony after the witness allegedly invoked his “Fifth Amendment privilege and his Sixth Amendment right to counsel.” This argument is without merit.
Legal Principles
The privilege against self-incrimination is guaranteed in the Fifth Amendment to the United States Constitution, which declares in part that “No person ... shall be compelled in any criminal case to be a witness against himself.” The principle espoused in the Federal Constitution was made applicable to the states in Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); State v. Coleman, 406 So.2d 563 (La. 1981). The privilege against self-incrimination in the Federal Constitution is embodied in La. Const, art. I, § 16, which states in part that “No person shall be compelled to give evidence against himself.”
The federal privilege against self-incrimination not only extends to answers that would, in themselves, support a conviction under a federal criminal statute, but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime. Hoffman v. U.S., 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951).
|19The federal privilege against self-incrimination protects a witness as fully as a defendant. State v. Knowles, 395 So.2d 678 (La. 1981). When the privilege against self-incrimination is invoked by a witness, there must be reasonable cause to apprehend danger from a direct answer. See Mason v. United States, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198 (1917); State v. Edwards, 419 So.2d 881 (La. 1982); State v. Grant, 41,745 (La.App. 2 Cir. 4/4/07), 954 So.2d 823, writ denied, 2007-1193 (La. 12/7/07), 969 So.2d 629; State v. Larpenteur, 636 So.2d 1103 (La. App. 4 Cir. 1994); State v. Seaton, 604 So.2d 182 (La. App. 4 Cir. 1992); State v. Roebuck, 532 So.2d 812 (La. App. 4 Cir. 1988); State v. Gerard, 96-366 (La.App. 5 Cir. 11/14/96), 685 So.2d 253.
La. R.S. 15:276 provides:
Louisiana law provides that a witness cannot be forced to criminate himself, but the judge is not bound by the witness’ statement that the answer would *965 criminate him, when from the nature of the question asked and the circumstances of the case such statement cannot be true.
The right to counsel is contained in the Sixth Amendment to the United States Constitution. The Sixth Amendment right of the accused to assistance of counsel in all criminal prosecutions is limited by its terms. It does not attach until a prosecution is commenced. The United States Supreme Court has, for purposes of the right to counsel, pegged commencement to the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. See Rothgery v. Gillespie Cty., Tex., 554 U.S. 191, 128 S.Ct. 2578, 171 L.Ed.2d 366 (2008).
The Sixth Amendment right to counsel is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a [ ¡^prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. McNeil v. Wisconsin, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); Texas v. Cobb, 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001).
The Louisiana. Supreme Court has held that a defendant has a Sixth Amendment right to counsel only after adversary criminal proceedings have been initiated against him, and then, only at specific, critical stages of the proceedings. Consequently, the ■ Sixth Amendment right to counsel is only an issue where adversary judicial criminal proceedings have begun against a defendant and where a defendant lacks assistance of counsel at a critical stage of the proceedings. State v. Carter, 1994-2859 (La. 11/27/95), 664 So.2d 367.
The right to counsel is also protected under La. Const, art. I, § 13. This constitutional provision attaches no later than a defendant’s initial court appearance or first judicial hearing and thereafter applies to those pretrial proceedings which would be considered “critical stages” under the jurisprudence interpreting the Sixth Amendment. State v. Carter, supra.
Discussion
In this case, Jarred Jackson was incarcerated in the same facility as Walker. Jackson was charged with armed robbery. He gave jail officials a note asking to speak to detectives in Walker’s case, claiming that Walker had confessed to him. Jackson was attempting to use the information as leverage to receive a reduced sentence for -the armed robbery charge. Jackson pled guilty and was sentenced to Serve 25 years at hard labor.
12i Jackson was called to testify at trial. He was a reluctant witness and expressed dissatisfaction with the plea negotiations in his case, claiming he was lied to and given a different sentence than what he had been told. Jackson said he did not want to be ‘present or testify and had nothing to say about Walker’s case. At one point, he asked- to speak to his lawyer, but was told that, as a witness, he did not have a right to counsel. Jackson was informed of the penalty for contempt if he refused to testify-
Jackson identified the note he sent to the detectives and admitted he gave them a statement that Walker confessed that he murdered his boyfriend by shooting him in the back of the head with a handgun.[1]
*966 On appeal, Walker urges that he was denied a fair trial because Jackson was compelled to testify after invoking his Fifth Amendment right against self-incrimination. The record shows that, even though Jackson said he did not want to participate in the trial and did not want to testify, he never invoked the right against self-incrimination. Further, he was not entitled to the privilege as a witness because he was not asked to make any statements against himself and he had no reasonable cause to apprehend danger from a direct answer. The trial court acted properly in requiring Jackson to testify. Because the Fifth Amendment right was not invoked, Walker is incorrect in arguing that the prosecution wrongfully put Jackson on the stand to force him to invoke the privilege in front of the jury.
Even though Jackson asked to speak to. his lawyer, as a witness in this case, he had no Sixth Amendment right to counsel. The privilege is offense | ^specific and no criminal prosecution regarding this matter had been instituted against Jackson; therefore, the privilege had not attached,
In his brief, Walker also argues that' he was prejudiced by Jackson’s ■ “racially motivated statement” that “The penitentiary is full of many black people. And I refuse to get up here to send another black person to the penitentiary for the state,” This unsolicited comment by Jackson was made while defense counsel was examining him. Walker also claims he was prejudiced by a comment contained in a question by the state to Jacksoji on redirect examination. The prosecution showed a picture of the blood-covered victim and explained that it showed “what your black friend over there did to another black man,” and asked if the picture changed his attitude about being present in court to testify. Walker claims the only remedy is to reverse his conviction.
The proper remedy for improper comments made by a witness is generally to seek an admonition under La. C. Cr. P. art. 771. The remedy for improper comments by the prosecution regarding race is a mistrial under La. C. Cr. P. art. 770, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury. There was no showing that the statements made in this matter might have created prejudice in the mind of the jury. After the witness made the unsolicited comment about his reluctance to testify, the prosecutor’s question was pertinent to the witness’s knowledge about the victim in this ease. Further, a contemporaneous objection in the trial court is required to preserve any alleged error for review. No such objection was- made; therefore, any objection was waived; See State v. Morgan, 367 So.2d 779 (La. 1979); State v. Washington, 444 So.2d 320 (La. App. 1 Cir. 1983), writ denied, 445 So.2d 450 (La. 1984).
RIGHT TO CONFLICT-FREE COUNSEL
In his pro se brief, Walker claims that he was denied his Sixth Amendment right to conflict-free counsel when his trial counsel had to cross-examine a prosecution witness he had represented in a previous case. This argument is without merit,
Legal Principles
In accordance with the dictates of the Sixth Amendment, as well as La. Const, art. I, § 13, a criminal.defendant’s right to effective assistance of counsel includes a right to conflict-free counsel. State *967 v. Clark, 2012-0508 (La. 12/19/16), 220 So.3d 583, 2016 WL 7378687. The issue of conflicting loyalties usually arises in the context of joint representation but can also arise where an attorney runs into a conflict because he or she is required to cross-examine a witness who is testifying against the defendant and who was or is a client of the attorney. State v. Kirkpatrick, 443 So.2d 546 (La. 1983); State v. Tart, 1993-0772 (La. 2/9/96), 672 So.2d 116; State v. Carter, 2010-0614 (La. 1/24/12), 84 So.3d 499.
If an objection as to a possible conflict of interest is raised pretrial,. the trial court must appoint separate counsel or determine if the claimed risk is too remote. If an objection to an attorney conflict of interest is not raised until after trial, the defendant must show -he was actually prejudiced. State v. Tart, supra. As stated in State v. Kahey, 436 So.2d 475 (La. 1983), where the record does hot establish that pretrial notification of the possibility of a conflict of interest was given to the court, the defendant must prove that an actual conflict of interest adversely affected his lawyer’s performance.
| ⅞⅛An actual conflict of interest is established when the defendant proves that his attorney was placed in a situation inherently conducive to divided loyalties. State v. Tart, supra. If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interest of the other client and the defendant are sufficiently adverse if it is, shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client. State v. Kahey, supra; State v. Diggs, 43,740 (La.App. 2 Cir. 12/10/08), 1 So.3d 673, writ denied, 2009-0141 (La. 10/2/09), 18 So.3d 101.
Discussion
When Walker’s attorney began his cross-examination of Jackson, he asked Jackson if he remembered that the' attorney had represented him in -the past. Jackson responded that he did remember. That was the extent of the discussion. The record shows that the attorney did not represent Jackson on the armed robbery charge. There, is no showing that the prior representation created an actual conflict of interest or that the attorney owed a duty to Walker to take any action’ that would be adverse to Jackson. There is no showing that the attorney used any confidential information obtained during his representation of Jackson during the cross-examination. The comment was fleeting and irrelevant, If anything, it made the' jury aware that the witness had a rather extensive criminal history. Walker has failed to show that he was prejudiced by the comment or the prior representation, or that an actual conflict of interest existed.
1 ^CONCLUSION
For the reasons stated above, the con- ' viction and sentence of the defendant, Gary Lewis Walker, for second degree murder is affirmed.
AFFIRMED.

. The note provided:
I need to speak wit [sic] the Head investigator that’s over Gary Walker’s case. He told me *966 what he Done!