COX, J.
*983 This criminal appeal arises from the First Judicial District Court, Caddo Parish, Louisiana. Following a jury trial, the defendant, Labroderick Alexander ("Alexander"), was found guilty as charged of second degree murder. Alexander was sentenced to life imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence. He now appeals his conviction and sentence, asserting that the State failed to present sufficient evidence to support the verdict. For the following reasons, we affirm.
FACTS
On July 17, 2016, Kevin White ("White") was shot. White died from his injury the following day. A grand jury indicted Alexander for the second degree murder of White on September 23, 2016. The jury trial began on May 1, 2017.
Arthur Sloan was the first to testify at trial. Sloan lived across the street from White's mother and testified that in the early hours of July 17, 2016, he was watching television when he heard two men arguing outside. He told investigators that he recognized one of the voices as belonging to White, whom he had known since White was born. Sloan stated that the other voice belonged to a man named Labroderick Alexander, whom he had known for about 10 years and knew to be White's cousin. Sloan identified Alexander in court. He asserted that he heard Alexander saying, "I'm about that, I'm about that," followed by a single gunshot. He then heard Alexander say, "See, I told you, I'm about that." Sloan called 911 and reported the shot fired.
Yolanda Williams, a police communications supervisor, testified that she received Arthur Sloan's 911 call on July 17, 2016, at 2:25 a.m. Next, Agent Carlos Glass-Bradley, who was working as a patrol officer at the time of the crime, testified that he responded to Sloan's call. Agent Bradley stated that Sloan relayed he had heard White arguing with another male, but was unable to identify the second voice.
Captain Victor Scott Phillips of the LSU Police Department testified that two separate cameras recorded White exiting a vehicle upon arrival at University Health Hospital, but the license plate was not captured by the video. The video showed White's path from the curb to the front doors and then over to the revolving doors, which Captain Phillips stated were always locked after 9:00 p.m. White continued around to the emergency room entrance where he was found by Officer Cerami.
Shreveport Police Officer Robert Cerami testified that in the early morning hours of July 17, 2016, he was on call at University Health Hospital when he was alerted to a man attempting to enter the emergency room. The man was bleeding profusely from his face and his tongue was hanging out; it appeared he had been shot in the face. While assisting the man to the trauma center, Officer Cerami asked the man who shot him. According to Officer Cerami, the man stated that he did not know the shooter and that it was a drive-by shooting. Officer Cerami declared that *984 he did not believe the man because the wound appeared to be a gunshot fired at close range. Officer Cerami notified dispatch that a man with a gunshot wound to the face had appeared at the emergency room. While the man was being treated, Officer Cerami stayed with White's family, who showed him a picture of White on Facebook. Officer Cerami was able to confirm that the picture matched the injured man he had helped.
Officer William Moak of the Shreveport Police Department patrolled in the Greenbrook Loop area. He testified that he heard both the 911 call about a shot fired at Greenbrook Loop and Officer Cerami's dispatch about the gunshot victim at the hospital. Upon arrival at the hospital, Officer Moak noticed blood spatter leading up to the front door, as well as blood smeared on the glass. Officer Moak spoke with White's mother, who advised him that her son had been shot and gave him their address. Officer Moak then notified officers to the crime scene.
Yolanda Hamilton, White's sister, testified that sometime around 2:15 a.m. on July 17, 2016, she received an anonymous phone call from a female warning her that "B[1] shot Kevin" in the face. She asserted that White was frequently with their cousin, Labroderick Alexander, whom she had seen at about 9:00 p.m. the night before the shooting. She asserted that Alexander appeared to be angry and upset.
Marilyn White, White's mother, testified that her son had lived with her prior to his death. She had last seen White the night before the shooting, when he returned home from work to check on her. She stated that White appeared to be in a good mood and was happy to be celebrating his birthday.
Corporal Jennifer White of the Shreveport Police Department Crime Scene Investigation Unit testified that at 3:00 a.m. on July 17, 2016, she was directed to process a crime scene in the 100 block of North Greenbrook Loop. She stated that she found blood spatter, a spent cartridge casing, and a portion of a gold removable cosmetic tooth in the street. A styrofoam cup and a water bottle were also found at the scene, but did not provide any viable latent prints. On July 19, 2016, Corporal White was called to process a white SUV and found blood spatter on the back of the driver's seat and on the left-side rear passenger seat, as well as a basket of cleaning supplies.
Cherica Royston, White's girlfriend, provided investigators with her cellphone, which contained text messages she had exchanged with White hours before he was shot.[2] Royston testified that White contacted her around midnight after he get off work. They had planned that White would shower, change, and come to Royston's house with food. However, during the next few hours, White's departure was delayed because he was waiting for his friend, Brandon Hanson (aka "Honey"), to give him a ride. Royston stated that at one point she called White and she could hear male voices arguing in the background but could not make out their words. At 2:14 a.m., White texted Royston that he might walk over to her home because Honey and Alexander were "tripping." At 2:22 a.m., White texted Royston that Alexander had pointed a gun at him and that White was about to "f**k him up frfr," which Royston *985 explained was an abbreviation for "for real, for real." That was the last time she heard from White.
Royston additionally testified that White and Alexander got along well, had a good relationship, and often did things for each other. She stated that White and Alexander saw each other almost daily, and she never saw them physically fight.
Brandon Hanson testified that he, Carlzays Hanson, Denise Hall, and White had been driving around in the white SUV when they picked up Alexander. Brandon identified Alexander in court. He stated that the group traveled to Greenbrook Loop and parked in front of the house belonging to his cousin, Arthur Sloan. Denise Hall stayed in the vehicle while the other three got out. Brandon asserted that White told Alexander "don't come back down here." He then heard the two arguing followed by a gunshot. Brandon ducked behind the vehicle and returned when it was quiet to find White holding his face. White told Brandon that he had been shot and needed to be taken to the hospital. Brandon proclaimed that White refused his suggestion to call 911, so he drove White to the hospital. After White got out of the vehicle at the hospital, Brandon drove off because he was scared. Brandon confirmed his prior testimony that he had cleaned the blood from the interior of the SUV the following day.
Brandon was asked to identify a statement he wrote and signed during his interview with Detective Elie. Below a photograph that Brandon confirmed was Alexander, Brandon wrote: "Brandon Hanson, July 19, 2016, shot Big Kevin in the face for argument, Kevin White." He then wrote "B," which Brandon said stood for "Broderick." Brandon clarified that his statement meant that Broderick shot Kevin in the face over an argument. However, Brandon refused to confirm that Alexander shot White, but he did confirm his handwriting in the statement. Even after review of the audio/video tape of his interview in which he told Detective Elie that Alexander shot Kevin and described both the shot and the gun used, Brandon still refused to confirm his pretrial statement.
On cross-examination, Brandon continued to state that he "did not recall" if he saw how White was shot. He testified that he was afraid of what would happen to him and said there was a lot of "stuff going on." Brandon expressed that he had been drinking alcohol and was out past curfew while on parole, which is why he was scared and drove off from the hospital so quickly.
Carlzays Hanson, Brandon Hanson's older brother, testified that he grew up with both White and Alexander. He identified Alexander in court. Carlzays stated that on July 17, 2016, he and his girlfriend, Denise Hill, were picked up by Brandon. They traveled to Bossier City to pick up White from his job. They then drove to White's house, where White showered and changed. Afterward, the group traveled to a nearby liquor store. At some point, they picked up Alexander. Carlzays expressed that Alexander had an aggressive attitude and made a "big commotion" because he did not want to get in the far back seat of the SUV. Despite pleas for Alexander to calm down, Carlzays said Alexander was angry and started a verbal altercation. Carlzays saw Alexander had a weapon on his hip at his waistline.
Upon returning to Greenbrook Loop, Carlzays testified that the group parked in front of Arthur Sloan's house, where everyone except Denise Hill got out. Carlzays asserted that everyone was intoxicated. He stated that Alexander had the gun in his hand as he continued to argue with everyone. Carlzays said that Brandon tried *986 to control the escalating situation between Alexander and White, who were arguing. According to Carlzays, White told Alexander to "put the gun down, fight like a man." He saw White hit Alexander in the face, but Alexander did not fall down. Carlzays then heard a "boom" and saw the gun fire as Alexander shot White in the face. He saw Alexander run from the Greenbrook Loop subdivision toward St. Vincent. Carlzays confirmed that he saw the shot take place.
Carlzays communicated that White ran to the SUV and said he had been shot in the face. Denise Hill got out of the vehicle, and Brandon drove White to the hospital. Carlzays and Hill ran to his cousin's house.
On cross-examination, Carlzays confirmed that White punched Alexander once in the face. While Alexander did not fall, Carlzays believed Alexander acted out of fear and reflex when he responded by shooting White in the face. He stated that everyone was drinking and using ecstasy. Carlzays again affirmed that he saw the flash of the gun when Alexander fired the shot and that White said "he shot me in the face." Carlzays testified that Alexander was the only one carrying a firearm. According to Carlzays, before White threw the punch, White told Alexander to put the gun down and fight, and Alexander responded, "I ain't about no fighting."
Denise Hill, Carlzays Hanson's girlfriend, testified that she spent the day with Carlzays and Brandon riding around before they picked up White and went to the liquor store. At one point, they picked up Alexander, whom Hill identified in court. Hill stated that Alexander appeared upset and mad. She said that Alexander and Carlzays "had words," then Alexander and White "had words." She did not recall the subject of the arguments.
Hill testified that the group traveled to Greenbrook Loop and parked in front of someone's house, where she remained in the vehicle. She said that she saw Alexander walk down the street, but not out of sight, then return. Hill then heard a gunshot and looked up to see Alexander standing there with the gun in his hand. She saw Alexander run off and White stagger over to the vehicle holding his face. Hill indicated that White said "he just shot me in the face, take me to the hospital." She left the vehicle, and White got in. Hill confirmed that she never saw anyone except Alexander with a gun.
Greg Clement, Caddo Parish Deputy Coroner Investigator, testified that he viewed White's body and took pictures for identification. He also received the DNA bloodstain card and the deformed lead core fragment that had been removed from White's neck.
Long Jin, M.D., was accepted as an expert in forensic pathology. He testified that he performed White's autopsy. Dr. Jin stated that the gunshot wound was a small, irregular hole found close to White's mouth. He opined that soot found near the mouth indicated that the gun was fired so close to White's face that the gun barrel left a contact mark. Reviewing the autopsy photos published to the jury, Dr. Jin noted the numerous large staples on the left side of White's face, where physicians had attempted to surgically repair the damage caused by the bullet to White's fractured jaw. Dr. Jin asserted that the bullet travelled from White's mouth, through the jaw, then perforated the trachea, which White needed in order to breathe. The bullet ended up in White's cervical spine at C6. Dr. Jin concluded that White's death was caused by a single, penetrating gunshot wound to the left side of his face, and the manner was by homicide.
On cross-examination, Dr. Jin testified that White was 5'10? and weighed 318 lbs.
*987 He stated that the .45 caliber bullet was "pretty big." Dr. Jin said that the toxicology report showed White had medications in his system from the surgery, along with some marijuana and a low level of methamphetamine.
Detective Johnny Elie of the Shreveport Police Violent Crimes Unit was the last to testify. He was informed by physicians that the gunshot obliterated White's mouth and tongue, and he was being prepped for surgery. Unable to speak with the victim, Detective Elie reviewed the hospital's security footage, which showed White being dropped off at the hospital in a white SUV. The vehicle immediately departed while White walked up to the building. Detective Elie testified that, based on information obtained during a canvas of the 100 block of Greenwood Loop the next day, he interviewed Avid Hall. Hall told Detective Elie that he had assisted his friend Brandon Hanson with cleaning blood from Hanson's white SUV at Hanson's home on Easy Street. Detective Elie stated that he proceeded to Hanson's residence, but Hanson was not home. However, Helena Monera, Hanson's girlfriend and owner of the SUV, gave Detective Elie consent to process the vehicle.
The State rested. Alexander exercised his right to remain silent, and the defense rested. After deliberating, the jury voted 11-1 to find Alexander guilty as charged of second degree murder.
On May 8, 2017, Alexander filed a motion for post-verdict judgment of acquittal, which the trial court denied.
Alexander appeared for sentencing on May 22, 2017. The trial court reviewed the sentencing guidelines set forth in La. C. Cr. P. art. 894.1 and found many factors were applicable. The trial court also noted that Alexander's offense was a crime of violence under La. R.S. 14:2. Alexander was sentenced to the mandatory sentence of life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. Alexander now appeals.
DISCUSSION
On appeal, Alexander contends that there was insufficient evidence to prove beyond a reasonable doubt that he was guilty of the second degree murder of White. Additionally, Alexander argues that he acted in self-defense after White punched him in the face. He asserts that the State failed to meet its burden of proving that he did not act in self-defense and that his actions did not constitute a justifiable homicide.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Ward , 50,872 (La. App. 2 Cir. 11/16/16), 209 So.3d 228, writ denied , 17-0164 (La. 9/22/17), 227 So.3d 827. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Bass , 51,411 (La. App. 2 Cir. 6/21/17), 223 So.3d 1242. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Haley , 51,256 (La. App. 2 Cir. 5/24/17), 222 So.3d 153.
Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he or she saw or heard something. State v. Howard , 49,965 (La. App. 2 Cir. 6/24/15), 169 So.3d 777. Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common *988 experience. Id. When the State relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove, and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438 ; State v. Robinson , 47,437 (La. App. 2 Cir. 11/14/12), 106 So.3d 1028, writ denied , 12-2658 (La. 5/17/13), 117 So.3d 918.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Glover , 47,311 (La. App. 2 Cir. 10/10/12), 106 So.3d 129, writ denied , 12-2667 (La. 5/24/13), 116 So.3d 659. The trier of fact is charged with making a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or in part. The reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Woodard , 47,286 (La. App. 2 Cir. 10/3/12), 107 So.3d 70, writ denied , 12-2371 (La. 4/26/13), 112 So.3d 837.
Second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(1). The penalty is life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1(B).
Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances and the actions of the defendant. State v. Walker , 51,217 (La. App. 2 Cir. 5/17/17), 221 So.3d 951. Specific intent can be formed in an instant. State v. Washington , 50,424 (La. App. 2 Cir. 3/16/16), 188 So.3d 350, writ denied , 16-0718 (La. 4/13/17), 218 So.3d 119.
The discharge of a firearm at close range and aimed at a person is indicative of specific intent to kill or inflict great bodily harm upon that person. State v. Lloyd , 48,914 (La. App. 2 Cir. 1/14/15), 161 So.3d 879, writ denied , 15-0307 (La. 11/30/15), 184 So.3d 33, cert. denied , --- U.S. ----, 137 S. Ct. 227, 196 L.Ed.2d 175 (2016). Specific intent to kill may also be inferred from the extent and severity of the victim's injuries and the defendant's use of a deadly weapon to produce those injuries, which involved serious risk of death. State v. Washington, supra .
The determination of whether the requisite intent to kill is present is a question for the trier of fact. State v. Walker, supra .
The eyewitness testimony presented at trial was sufficient to establish that Alexander shot White in the face, and White died as a result of the gunshot wound. Brandon Hanson, Carlzays Hanson, and Denise Hill testified that they saw Alexander with a gun. They also stated that they witnessed Alexander arguing with White shortly before they heard the gunshot. Their testimony was corroborated by Arthur Sloan, who disclosed in an interview that the voices arguing outside his home belonged to White and Alexander. Additionally, White's sister received an anonymous phone call from a female telling her that "B shot Kevin" in the face. White's girlfriend also had a text message from White saying that Alexander had pointed a gun at him. Finally, Carlzays asserted that he saw Alexander shoot White in the face. Based on this evidence, the State met its burden of proof.
*989 The testimony was also sufficient to establish that Alexander had the specific intent to kill or inflict great bodily harm. Dr. Jin testified that Alexander fired the gun close enough to White's face that the barrel left soot marks. Firing this close to White's face was guaranteed to result in, at a minimum, great bodily harm. Unfortunately, however, the shot resulted in White's death. A rational trier of fact could have found the essential elements of second degree murder were proven beyond a reasonable doubt. This assignment of error lacks merit.
Alexander further asserts that he acted in self-defense. A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(A). The possibility of retreat may not be considered as a factor in determining whether or not the defendant had a reasonable belief that deadly force was reasonable and apparently necessary. La. R.S. 14:20(D).
When the defendant claims self-defense, the State has the burden to prove beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Edwards , 49,635 (La. App. 2 Cir. 2/26/15), 162 So.3d 512, 518, writ denied , 15-0628 (La. 2/5/16), 186 So.3d 1163. When a defendant claiming self-defense challenges the sufficiency of the evidence on appeal, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. Id.
Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. State v. Jones , 48,458 (La. App. 2 Cir. 11/20/13), 128 So.3d 593, writ denied , 13-2926 (La. 5/30/14), 140 So.3d 1173. The use of deadly force against an unarmed victim, even in the midst of a physical altercation, may be an excessive use of force. State v. Edwards, supra .
A person who is the aggressor or who brings on a difficulty cannot claim self-defense, unless he withdraws from the conflict in good faith. La. R.S. 14:21. Not only must the aggressor withdraw from the conflict, but the withdrawal must be in such a way that the other person "knows or should know" of the desire to withdraw. State v. Edwards, supra . If the aggressor's withdrawal is not made sufficiently known to his adversary, he is not eligible to claim the justification of self-defense for the homicide. Id.
The eyewitness testimony at trial was sufficient to establish that Alexander was the initial aggressor. According to witnesses, Alexander was angry and arguing with Brandon Hanson and White from the moment he got into the SUV that night. Alexander was the only person with a gun, and he refused to put it down. Although Carlzays Hanson stated that White punched Alexander in the face, Alexander did not fall down or retreat. Instead, Carlzays saw Alexander shoot White in the face.
Based on the testimony, Alexander did not have a reasonable belief that he was in imminent danger of losing his life or receiving great bodily harm. Shooting White with a gun at close range was not necessary to save himself. Viewing the evidence in the light most favorable to the prosecution, the trier of fact could have found beyond a reasonable doubt that Alexander *990 killed White, and the homicide was not reasonably committed in self-defense.
CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.

Yolanda clarified that Labroderick Anderson went by the nickname "B."

Officer Jeff Allday of the Shreveport Police Department testified that he captured the text messages from a third party app called Ding Tone using screen shot and UFED Cellebrite, a hardware and software solution used to capture digital data from cellphones.