Judgment rendered June 28, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,052-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

JAYLIN M. WAYNE                             Appellant

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Lincoln, Louisiana
Trial Court No. 73979

Honorable Bruce E. Hampton, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Mary Constance "Connie" Haines

JOHN FITZGERALD BELTON               Counsel for Appellee
District Attorney

LEWIS ALLEN JONES
TRACY WAYNE HOUCK
Assistant District Attorneys

* * * * *

Before STEPHENS, HUNTER, and MARCOTTE, JJ.

MARCOTTE, J.

This criminal appeal arises from the Third Judicial District Court, Parish of Lincoln, the Honorable Bruce E. Hampton presiding. Defendant, Jaylin Wayne, was convicted of two counts of second-degree murder and sentenced to life imprisonment at hard labor without benefits on both counts, to be served consecutively. Wayne now appeals arguing there was insufficient evidence to support his convictions. For the following reasons, we affirm defendant's convictions and sentences.

On February 6, 2020, Wayne was charged by superseding bill of indictment with two counts of second-degree murder, in violation of La. R.S. 14:30.1.[1] In count one, defendant was charged with the second-degree murder of Monquiarious Deontae Caldwell ("Caldwell"), and in count two, defendant was charged with the second-degree murder of Earl Leroy Andrews ("Andrews"). Both offenses occurred on October 25, 2017.[2] Wayne pled not guilty to the charges.

Following the empaneling of a 12-member jury, a trial was held October 28-30, 2021, where the following evidence was adduced. Tyresha Scott ("Tyresha") testified that she was a student at Grambling State University ("Grambling"), located in Grambling, Louisiana, on the date the victims were killed. Tyresha lived on-campus on the second floor of a dormitory named Bowen Hall. Homecoming activities were occurring on the night of October 24; there were a lot of parties on campus at that time

---

[1] Wayne was initially charged by bill of indictment with two counts of first-degree murder.

[2] Mention of the dates October 24, October 25, and October 26, refer to the period of time of October 24-26, 2017.

and alcohol was served at most of the parties. Tyresha stated that she knew Andrews prior to his death and they had mutual friends in common.

Tyresha first saw Andrews on the night of October 24 in front of her dorm room. Tyresha was trying to enter her dorm room with her friends Teyan Cormier ("Teyan"), Alijah Smith ("Alijah"), Tyler Drone ("Tyler"), Peter Guy, Francois Elzy, and Kayla Lee ("Kayla"). Kayla was Wayne's girlfriend and lived in a first-floor dorm room in Bowen Hall. Tyresha left the key to her dorm room in the car, but her roommate opened the door. As Tyresha and her group of friends began to enter her dorm room, Andrews entered the hallway from a dorm room across the hall; he was alone at that time. Andrews then entered the dorm room with her friends and invited the group to a party, which they agreed to attend.

Tyresha testified that, in a "playful manner," Andrews said to Kayla, "When you gonna leave that nigga alone and come mess with me?" Tyresha said that Kayla replied, "Leave me alone, leave me alone. I'm gonna ride or die for him, I'm gonna ride or die for him." Tyresha stated that Kayla seemed agitated by Andrews' words and that Teyan said to her, "Kayla, it's not that serious. You know he play like that. It's not that serious for you to be reacting like that." Kayla and Teyan argued, the argument got heated, and the two were about to fight each other. Kayla walked off and went into Tyler's room, which shared a common area with Tyresha's room.

Andrews followed her and apologized and said, "I was just playing. I wasn't serious." Andrews got on his knees in front of Kayla to apologize and Tyresha stated that she did not acknowledge him. Kayla knew Andrews prior to that evening and Tyresha did not know of any problems between the

2

two. Andrews said, "I didn't mean for this to get started between y'all," meaning Kayla and Teyan.

Tyresha testified that the last time that Andrews tried to apologize, Kayla "was on her phone walking out and was like, 'I'm not worried about none of this. I'm fixing to call my nigga, I'm fixing to call my nigga' and then she left." Approximately 20 minutes after Kayla left, Tyresha heard four shots from inside her dorm room. Tyresha identified Wayne in court. Tyresha stated that Andrews was tall and of slim build, but that Wayne was heavier than him.

Teyan testified that she was a Grambling student in October 2017. On the night of October 24, she, along with Tyresha, Aliyah, Tyler, and Kayla, went to an off-campus Homecoming party and returned to campus. Teyan stated that she had not been drinking that evening, and no one else in her group had been drinking except Kayla. When the group got to the dorm room, they realized they did not have the key, so they knocked on the door. At that time Andrews came out of the room across the hall. Teyan and Kayla knew Andrews prior to October 24-25, and Teyan described him as "very friendly" and that he was "the life of the party." Teyan testified that Andrews invited the girls to another party, and they said that they would join him; Andrews agreed to wait for them.

Teyan went to the bathroom upon entering the dorm room, and when she returned, she heard Andrews say to Kayla, "Drop that zero and get a ten." Teyan stated that when Andrews made the "zero-ten" comment, he was joking, and "We were all laughing," except for Kayla. Kayla was mad and told Andrews to "say it to his face," referring to her boyfriend, Wayne, whom Teyan knew. Teyan identified Wayne in court. Teyan testified that

3

Kayla was yelling in Andrews' face, and she put her arm between the two trying to calm Kayla down, but then she and Kayla almost got into a physical altercation.

Teyan stated that Andrews got on his knees and apologized to Kayla, saying that he didn't mean for anything to happen, and "He was just trying to laugh and joke before we went out." Kayla was then "on the door on her phone saying she was going to call her nigga." Kayla was continuing to get more and more upset and that she was in the hallway "still talking smack."

After Kayla left, Andrews continued to apologize, again getting on his knees to say he was sorry, stating, "He didn't want…us two friends fighting over a joke." Andrews left when the dorm's Resident Assistant ("R.A.") came, and Teyan left with the R.A. to write an R.A. report.

On her way back to her dorm, Teyan saw Wayne outside through the dorm window. Teyan described Wayne as wearing black pants with a white undershirt and a black and white hoodie. Prior to the shooting, Teyan knew Wayne to wear a "man purse" or "fanny pack." She said that it was black with designs on it, or a "Gucci one." Wayne wore the bag close to his person in different positions on his body. Teyan did not know what Wayne kept in the bag. She testified that when she saw Wayne outside Bowen Hall the fanny pack was under his jacket, that she could see the black bag on top of the white shirt. Teyan testified that she saw Wayne with a friend, but she didn't know who the friend was. Teyan said that when she saw defendant outside Bowen Hall, "[Wayne] looked at me with rage in his eyes." Teyan saw Wayne there around midnight, and about five minutes later she heard three to four gunshots.

4

An audio recording of the statement that Dakortnious Clemons ("Clemons") made to Major J.D. Driskell ("Maj. Driskell"), of the Lincoln Parish Sheriff's Office, on October 25, was entered as an exhibit and played before the jury.[3] Clemons was an eyewitness to the shooting. He told Maj. Driskell that he rode with Caldwell in Caldwell's car to Grambling around 5:00 p.m. to participate in a Homecoming event. After the event Clemons and Caldwell went to a dorm room, and at some time in the evening they met up with Andrews. Andrews was away from the dorm room for a time, and Clemons stated that he later returned and R.A.s appeared and told everyone who was not a resident that they needed to leave. As Andrews, Caldwell, and Clemons were exiting the dormitory with a few girls, Andrews told them that there had been a fight involving some other girls in a different dorm room.

Clemons said that as they left the dorm building, the group was staggered far apart, and he was behind both Andrews and Caldwell and that Caldwell was at the front of the group. A black male dressed in all black, with a hoodie pulled over his head and tied around his face, approached Andrews and said "What's up?" The man had a full beard. Admitted photos of Wayne taken around the time of the shooting show him with a full beard. Clemons said that Andrews removed his jacket and the two immediately began fighting. Clemons stated that it seemed like the two knew each other given how quickly the interaction escalated. The man picked up Andrews and slammed him to the ground, and Caldwell ran back to help Andrews out.

---

[3] The parties stipulated that his recorded statement would be introduced in lieu of his live testimony and, if called to testify, Clemons' testimony would be consistent with what he said in the recording.

Caldwell had a bottle with him and stated that he was going to hit the man with the bottle. Clemons said that at no time did Caldwell hit the man with the bottle. At that point, Andrews and the man were on the ground, and Caldwell was standing.

Clemons then saw the man fire a gun, heard several gunshots, and he ran. Clemons stated that Caldwell fell where he stood and Andrews ran while the gun was being fired. Clemons retuned to Caldwell and tried to get Caldwell's car keys out of his pockets so that he could take him to a hospital, but other bystanders told him not to. Clemons described the shooter as shorter than Andrews, but heavier.

Alexys Williams ("Alexys") testified that she was a Grambling student in 2017, and she attended Homecoming parties on the evening of October 24. Alexys stated that she did not know Kayla, but she had known Andrews and Caldwell for years prior to that night as they were all from Farmerville, Louisiana. Andrews attended parties with her that night, along with his friend Caldwell, also known as "Booty." She did not know how much Andrews and Caldwell had to drink, but she did not recall the victims taking any drugs, and she did not know them to do that. Alexys, Andrews, Caldwell, and others left a party at a dorm around 12:00 a.m. to go to another party. At some point after they got outside, Alexys sat down on the steps, because she had had too much to drink and was "tipsy." Andrews returned to check on her, she got up, and she and Andrews walked alongside each other. Others in their group had gotten ahead of her and they were trying to catch up.

Alexys stated that Wayne, whom she knew as a fellow Grambling student, approached Andrews. Wayne was wearing a hoodie, and as soon as

6

Wayne and Andrews were near each other, they began to fight. Alexys testified that Wayne threw the first punch and then wrapped his arm around Andrews and "slung him to the ground." At that point, Wayne was on top of Andrews pinning him to the ground and punching him. Alexys said that Wayne was bigger than Andrews, and that Andrews was "skinny" and "small." Caldwell showed up and wrapped his arms around Wayne to pull him off of Andrews, but he was unsuccessful.

Alexys testified that Wayne then stood up and pulled out a gun from his body somewhere and shot at Andrews and Caldwell. She heard three shots. Alexys was right beside Wayne when he fired the gun, and she saw "gunfire" coming from the weapon. Alexys ran, but by the time she started running, the three shots were already fired. When the shots started being fired, she saw blood splattering. Alexys said that Wayne did not hesitate to fire when he pulled out his gun and the shots were back to back. Alexys identified Wayne in court.

Alexys testified that she did not remember if Andrews removed any clothing to engage Wayne in a fight. Caldwell approached within seconds of Wayne being on the ground with Andrews, and Alexys affirmed that there was not much fighting between Andrews and Wayne before Caldwell participated in the fight. When asked if she remembered telling an investigating officer that Caldwell was hitting and kicking Wayne to get him off Andrews, Alexys stated that she did not. When asked if she saw Caldwell with a bottle or hear him say he was going to knock Wayne out with a bottle, Alexys said no.

Chief Howard Caviness ("Chief Caviness"), was the chief of police for Grambling in October 2017. He received a call around 12:20 a.m. on

October 25, about a double homicide that occurred on campus. Chief Caviness stated that later that evening, he received a call informing him that a person named "Jaylin" came to his office to turn himself in; Chief Caviness went to his office and met with Wayne. Chief Caviness was asked if he saw in the courtroom the person who turned himself in on the night of October 25, and he identified Wayne, saying, "I think that's him."

Chief Caviness described the way Wayne looked on October 25, saying had an abrasion on his forehead and what looked like cuts on his hands, but the wounds did not appear life-threatening. Wayne said to Chief Caviness, "I'm here to turn myself in." When Chief Caviness asked him what he was there to turn himself in for, Wayne responded, "Because of what happened last night." Chief Caviness asked, "Are you talking about the double homicide?" and Wayne "shook his head in an agreeing manner." Wayne was not handcuffed at the time and was free to go whenever he was ready. Chief Caviness contacted Maj. Driskell when Wayne turned himself in.

On cross-examination, Chief Caviness said that Wayne did not make a statement of guilt and that, on the evening of October 25, Wayne looked like he had been in a fight or a minor vehicle accident and that he was "marked up."

Alijah testified that on October 24 and 25, she was a Grambling student and she attended parties with Tyler, Tyresha, Kayla, and Teyan as a part of the Homecoming festivities. She said that she did not drink at the party she attended the night of October 24. The group of girls left the party and arrived at Bowen Hall, and they had to knock on the door of their dorm room, because they left the key in the car. Before they were able to enter

8

their dorm room, Andrews approached the group and asked if they wanted to go to a party. Alijah knew Andrews and portrayed him as friendly, outgoing, and "everybody loved him."

Andrews came into the dorm room and started flirting with Kayla, telling her that she needs to "stop messing with the lame niggas on campus and mess with him." She did not hear Andrews call Kayla a "bitch," but she agreed that hearing that word would upset someone. Alijah testified that she did not take any of Andrews' comments as insulting, but Kayla seemed upset and offended by what he was saying. Teyan tried to intervene and told Kayla to calm down and that she was overreacting about what Andrews was saying. Teyan's attempts to defuse the situation did not work, and Andrews got on his knees and apologized several times.

Alijah stated that Kayla "kept saying that she was going to call her nigga, which is Jaylin," and that Kayla left the dorm room on her phone. Alijah identified Wayne in court. Alijah saw Wayne later that evening walking toward Bowen Hall with Kayla. Alijah, Tyler, and Peter Guy had gone to her car, which was parked in a lot near where the victims were shot, to get away from Teyan and Kayla's argument. The three were talking in the car and listening to music at a low volume when she heard three gunshots. She testified that the first two shots were one right after the other, but there was a hesitation between the second and third shots. Alijah did not see the shooting, but only heard it.

Prior to Kayla testifying, the state admitted into evidence an affidavit for a search warrant for her phone records, the phone records for her phone, the phone itself, and an extraction performed on the phone. Kayla identified the phone as hers. Kayla met Wayne her first semester at Grambling. She

9

identified him in court as defendant. For about one year before the shooting, she and Wayne dated exclusively and had a sexual relationship. She and Wayne were still in a relationship at the time of his trial and both frequently said they loved each other. Kayla confirmed that she and Wayne had spoken on the phone more than 2,000 times since he was arrested.

Kayla stated that on the evening of October 24, during Homecoming, she and her friends Teyan, Tyler, Tyresha, and Aliyah were going to a party, but she was not sure if her group had been drinking. Kayla lived in Bowen Hall at the time but not in the same room as her friends; she could not recall if her dorm was on the first or second floor. Wayne lived on campus, and she visited him in his dorm room, but she could not recall the name of the dorm.

Kayla knew Andrews prior to the evening of October 24. That night, she saw Andrews coming out of a dorm room as she and her friends were entering their dorm room at Bowen Hall. Andrews spoke to the group in the hallway and inside the dorm room trying to get the girls to go to a party. She said that the dorm was laid out such that the first room they entered upon walking through the door was a common area which contained couches and chairs.

Kayla testified that when they got into the common area of the dorm, the first thing Andrews said to her was, "Stop fucking with them fuck ass niggas you fucking with and come fuck with a real nigga." Kayla did not know if Andrews was aware that she was in a relationship with Wayne, but she assumed that Andrews was referring to him. She said she did not feel disrespected at that point, but "I did feel like where is that coming from when he said that." Kayla testified that Andrews also referred to her as a

"beautiful bitch" and she believed Andrews was flirting with her. Kayla described Andrews' "hitting on" her as a little bit aggressive, and said that she though the word "bitch" was disrespectful, but she was not mad. Kayla said that was the first real interaction she had with Andrews.

When asked how she reacted to Andrews' comments, she stated that she did not remember and could not recall getting in his face or getting loud with him. At that point Teyan jumped in. When asked what there was to jump into, because she did not react to Andrews' statements, Kayla responded that she felt like Teyan was "coming at me," because they were holding up the process of going to another party. Kayla said Teyan "pissed me off." Kayla testified that she and Teyan were not close, but they had had issues in the past and things had "built up" between them, so she did not understand why Teyan "was coming at me like that."

Kayla gave a statement to Maj. Driskell not long after the shooting occurred. When questioned about her statement, Kayla repeatedly said that she did not remember or she could not recall what she said to Maj. Driskell.

Kayla testified that she shakes when she's mad, so she might have been shaking during her exchange with Andrews and Teyan, and that she was so mad she was crying. When she and Teyan were arguing, Andrews was on his knees trying to get them to stop arguing, but she couldn't remember his exact words.

Kayla and Wayne have talked "a lot" on the phone since he was arrested and charged with two counts of second-degree murder. When asked if Wayne told her on one of those phone calls that he would like to get her in one of the side rooms near the court, Kayla said she did not remember him saying that, but that was something she would remember if Wayne had said

11

it. The state admitted into evidence an audio recording of a jail phone call that occurred between Wayne and Kayla about four days prior to the commencement of trial, and she affirmed that they were the persons speaking on the phone. The recording was played for the jury, and it confirmed that Wayne said he wanted to get Kayla into a side room at the court.

After she argued with Teyan, Kayla started walking out of the room; she said that she did not remember saying she was going to call Wayne as she left the dorm room. Kayla left the room and called Wayne. She testified that she did not mention anything that Andrews said to her to Wayne. She said that she told Wayne that Teyan "pissed me off or whatever," and that she was crying to Wayne on the phone and was "all over the place." They agreed to meet. Kayla did not know how long the phone call lasted. She then called her sister, Cory, with whom she "shared everything."

Kayla was next questioned about her phone records. The records show that she first called Wayne at 11:18 p.m. on the night of October 24, but he did not answer. She called him again at 11:41 p.m., and they spoke for three minutes. She then immediately called Cory at 11:45 p.m. and spoke with her for 30 minutes. Kayla testified that she spoke with Cory while she drove to pick up Wayne where he was located. Kayla spoke with her sister the entire time Wayne was in the car with her. Kayla agreed that it was possible that Wayne was in the car when she discussed with Cory the comments that Andrews made to her. Kayla and Wayne went to her dorm room as she continued to speak with Cory. Kayla was still on the phone with her sister when Wayne left her dorm room. She said that she heard a

12

"loud commotion" after Wayne left and while she was still on the phone with Cory. Kayla denied hearing gunshots.

At 12:07 a.m. on October 25, while Kayla was still speaking with Cory on her phone, she received a call from Wayne which lasted for 30 seconds. Kayla testified that she did not remember what Wayne said to her during that call. The next time Wayne and Kayla spoke was 1:48 a.m. on October 25. Kayla said that she did not remember the exact conversation she had with Wayne at that time, but she remembered checking on him to see if he was okay, because of what had happened on campus. Kayla testified that at that point she knew that there had been a shooting on campus and two people were killed, but she could not remember if Wayne said whether he was okay in her 1:48 a.m. phone call with him. When questioned if she ever asked Wayne if he had anything to do with the shooting, Kayla responded that she did not remember what was said in that conversation.

When asked whether she could indicate where in her phone records she made calls to Wayne in which she questioned him about whether he was involved in the shooting, Kayla said, "No, because I don't remember the conversations." She later denied discussing on the phone anything about the shootings, including whether Wayne was "jumped" and he defended himself. Kayla spoke with Wayne a number of times prior to 3:56 a.m. on the morning of October 25, but she did not speak with Wayne on the phone again until 7:36 a.m. Kayla affirmed that she was with Wayne during that time period.

Wayne was in a friend's car when Kayla met up with him, and Kayla got into the back seat. Kayla testified that Wayne's face was "really, really

13

messed up," "bruised up bad," and "red," but she did not consider his injuries serious enough for him to need to go to a hospital. Kayla was shown photographs of Wayne, and she said that when she saw Wayne early on October 25, after the shooting, his face looked worse than what was depicted in the photographs. Kayla testified that Wayne told her he got jumped. When asked if Wayne perhaps said to her, "I was fighting with Earl and somebody else jumped in," she responded, "It's possible, yeah." Kayla understood Wayne to mean that the fight involved himself and two others. Kayla also recalled that Wayne said something about hurting somebody.

The state then read part of Kayla's statement to Maj. Driskell to her; it reads[4]:

> But he was like, I had gotten into a fight with Earl, and I'm like, what? And then I'm like, you've got to be kidding me. They dead. They dead. You know what I'm saying? And he was like, look at my face. So, I turned on my flash, because he was in a dark car, I couldn't see nothing, and then that's when I seen his face and he said, I got jumped. I'm like what? By who? He didn't know the other dude's name and I didn't know him either or whatever. He like, I got jumped, and then he didn't let me know. He didn't give me no details. I don't know what time this was. I don't really know exact words, but he told me, this stuff fixing to get out. This is going to be everywhere. This is fixing to be everywhere. Earl knew a lot of people. I didn't know that until all these people was outside. Him was like, I'm fixing to go turn myself in. Yep, I'm fixing to turn myself in.

Kayla said that she did not recall making that statement, but she did not deny making the statement to Maj. Driskell. Kayla returned to Grambling the morning of October 25 after meeting with Wayne. Later that same day, Wayne told Kayla he was going to turn himself in. Kayla said that Wayne admitted that he hurt the people that jumped him.

---

[4] The statement has been edited for readability.

Kayla said that she was more upset with Teyan than Andrews when she left her friends' dorm room. She said that she did not leave the dorm on bad terms with Andrews and she felt embarrassed by her altercation with Teyan and she wanted to see Wayne, because he was her boyfriend. Wayne could hear what Kayla was saying to her sister on the phone, but she did not direct him to go find Andrews and defend her honor. Kayla said that the majority of the conversation she had with her sister was about how Teyan's comments made her feel.

Maj. Driskell testified that he worked as a detective in October 2017 for the Lincoln Parish Sheriff's Office and he investigated the shooting that occurred at Grambling on October 25. Upon arriving on the scene, Maj. Driskell first contacted Clemons, whom he interviewed, and then he processed the crime scene. Several photographs of the crime scene were admitted. One of the photos depicts a black sweater laying on the ground.

Another photo depicts Caldwell's body with a black cellphone laying near his body, shell casings, and the remnants of a glass Mad Dog 20/20 bottle on the concrete in the area of Caldwell's right hand. The cell phone belonged to Andrews. Maj. Driskell observed what appeared to be a gunshot wound in the middle of Caldwell's chest.

A different photograph portrays Andrews' body. Maj. Driskell noted a black spot on a brick wall in the photograph, which he explained was determined to be a patch of Andrew's hair. Andrews ran from the scene of the shooting and was believed to have died on his feet. Maj. Driskell clarified that during his "terminal collapse" Andrews collided with the wall, leaving an injury on his head and some of his hair on the wall at a spot that was two feet, three inches from the ground. Maj. Driskell stated that the

shooting occurred where Caldwell's body was located, and Andrews fled from the shooter, which is why his body was located in a different location.

The photograph shows injuries to Andrews' face consisting of a laceration at his hairline believed to be caused by his collision with the brick wall, cuts to his left ear, which Maj. Driskell believed were caused by Andrews' earring being ripped out, bruising and swelling, including a knot that was starting to form, and some sort of tearing injury to Andrews' lip. Maj. Driskell believed the injuries to Andrews' face were not caused by his collision with the wall. Andrews also had an abrasion to his right hip.

Another photo depicting Andrews shows a gunshot wound to his chest. Maj. Driskell testified that the chest wound appeared to be a close contact gunshot wound, meaning the shooter placed the gun directly on Andrews' skin before firing. The photograph shows what looks like a burn around the bullet wound with some bruising.

It was discovered during the autopsy that Caldwell had been shot twice, once in his chest and a second time near the front side of his left leg between his ankle and knee. Three 45 mm shell casings were recovered from the scene; Maj. Driskell testified that the casings were made for a 45 mm handgun, and they came from the bullets fired from the handgun used to kill the victims.

Maj. Driskell testified that Wayne approached the victims from the north and fled the scene immediately after the shooting, going back in the direction from which he came. At the time, Wayne was a Grambling student and lived in Attucks Hall, a dorm near Bowen Hall. The shortest route between where Kayla resided in Bowen Hall and Wayne's dorm room in

16

Attucks Hall was in the opposite direction from the way he went when he left her dorm room.

A DNA report was admitted and Maj. Driskell testified that it showed that Wayne's DNA was found under Andrews' fingernails. On the evening of October 25, Maj. Driskell received a call from the Grambling Police Department notifying him that an individual had arrived to turn himself in. At the Grambling police station, he encountered Wayne, who was informed of his rights, pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Wayne did not provide a statement.

Maj. Driskell did not note any serious injuries to Wayne at the police station. He observed some redness on the right side of Wayne's head around or above his temple, but he did not see any other injuries. Maj. Driskell took a photograph of Wayne at the Lincoln Parish Sheriff's Office on the evening of October 26, the day after the shooting. Maj. Driskell stated that the only difference in appearance between how Wayne looked on October 25 and how he looked in the photograph taken the next day, was that he appeared to be "extremely under the influence of narcotics… consistent with someone who had consumed a large amount of marijuana" in the October 26 photograph. Wayne told Maj. Driskell on October 25 that he did not have a phone when he asked him for his phone number. That statement was untrue as Maj. Driskell later executed a search warrant to retrieve Wayne's phone records.

On cross-examination, Maj. Driskell affirmed that he had investigated numerous violent crimes. When asked if he considered a bottle a dangerous weapon, he said that it could be depending upon the manner in which it was intended to be used. Maj. Driskell said that the weight and hardness of the

17

bottle, and the fact that it's made of glass that could be used to cut someone make it a potentially dangerous weapon.

Maj. Driskell confirmed that Alexys was "tipsy" the night of the shootings and that she was near the victims when they were shot. He testified that Alexys said in her statement to him that Caldwell was lying face down and was shot in the back. Maj. Driskell stated that Caldwell had an entry wound in his front chest, making Alexys' statement about where Caldwell was shot on his body incorrect.

Maj. Driskell affirmed that there were several exits that Wayne could have taken out of Bowen Hall after he left Kayla's room on October 25. Maj. Driskell said that Kayla told him that she felt like what happened was her fault, referring to the murders of Andrews and Caldwell.

Dr. Frank Peretti ("Dr. Peretti") was accepted as an expert forensic pathologist and he performed the autopsies on Caldwell and Andrews. Dr. Peretti testified that Caldwell had a single gunshot wound to his right upper chest which pierced his heart, went through his vertebrae and spinal cord, and exited his left upper back. Dr. Peretti stated that the bullet was traveling through Caldwell's body "right to left, front to back, and upward." Caldwell also had a superficial graze wound to his front leg that hit just the skin and fatty tissue. No bullets or bullet fragments were recovered from Caldwell's body. Dr. Peretti noted that Caldwell did have ant bites on his body, but he had no evidence of disease and was a "relatively healthy 22-year-old." Caldwell's blood tested positive for alcohol and methamphetamine. Dr. Peretti stated that Caldwell's cause of death was gunshot wounds to his mid-chest and left lower extremity, and his manner of death was homicide.

18

Dr. Peretti testified that Andrews had a gunshot wound to his right mid-chest with evidence of close-range firing on his skin. Dr. Peretti described Andrews' gunshot wound as a "loose contact wound," because he had soot deposition and gunpowder stippling on his skin, but there was no muzzling print on his skin. When the gun was fired, it was against Andrews' skin, but was not pressed into his chest. Dr. Peretti estimated that the gun was less than two inches from Andrews when fired. The wound path included Andrews' skin, underlying fatty tissue, ribs, heart, thoracic artery, and lung, and the bullet exited his left lower back. The trajectory of the bullet was "right to left front, then back and downward." No bullets or bullet fragments were found in Andrews' body. Andrews also had facial abrasions and contusions on his scalp, but no evidence of disease.

When asked if a person was running, fell, and hit a 2 1/2-foot wall with the top of his head, Dr. Peretti affirmed that he would not expect the rest of the person's face to contact the wall. Dr. Peretti stated that when a person gets into a physical altercation, you would expect to see bruising. However, Dr. Peretti also said that an absence of bruising on a deceased person's face does not necessarily mean the deceased refrained from fighting, because the heart has to be pumping for bruising to occur. Dr. Peretti found that Andrews had no injuries to his hands, but did have an abrasion on his forearm. Andrews' toxicology tests showed the presence of alcohol, but no drugs. Dr. Peretti affirmed that there was no way to know the position of the victims and shooter at the time of the shooting. Dr. Peretti stated that Andrews died from the gunshot wound to his chest and his manner of death was homicide.

Dr. Peretti confirmed that Caldwell was shot at an upward trajectory and he had not been shot in his back. He confirmed that Andrews was shot at a downward trajectory

Dewayne Fletcher ("Fletcher") testified that he met Wayne at the Lincoln Parish Detention Center and they were housed in the same cell pod. He interacted with Wayne in the common area of the pod, and Wayne told him that someone he knew named Earl had disrespected his girlfriend, because they discussed it on the phone. Wayne told him Kayla was crying and telling him she was disrespected. Wayne stated he was angry and that he texted Kayla saying he was going to "push up on" Andrews, meaning he was going to confront him. Wayne said that, after texting Kayla, he went looking for them and found them. Wayne stated that he had an HK45 handgun on him in a side pouch, which Fletcher described as a bag a man can put around his shoulder.

Fletcher stated that Wayne informed him that he "walked up on" Andrews by a baseball field at Grambling. Bowen Hall is located beside a baseball field. Wayne said that Andrews pulled his pants up in a defensive way to protect himself. The two started fighting, but Wayne did not tell Fletcher who threw the first punch. Wayne said that he started to "get the best of" Andrews with Wayne on top of him on the ground. Wayne stated that he was getting hit from behind from someone else while on top of Andrews who was still on the ground. Fletcher said that Wayne called the second person "Booty." Wayne said that one of Booty's punches "irritated" him and he went into a rage, so he drew his gun out and shot him. Wayne stated that one shot grazed Booty's leg and the other shot hit him in the diaphragm.

20

Fletcher testified that Wayne said he turned back to Andrews, who had gotten to his feet at that point, and Andrews stood there in shock, as though he didn't know whether to run or stay there. Wayne stated that he was still in a rage, so he shot Andrews in the same place on his body as he shot Caldwell. Wayne told Fletcher that Andrews took off running and ran into a wall. Wayne then ran to a Subway restaurant and called a friend to pick him up. Wayne said that he considered throwing the gun into a trash can at Subway, but he decided to keep it. Wayne said that he later took the gun apart and got rid of it.

Fletcher testified that Wayne said there was a bottle lying beside one of the victims after he shot them, that he was going to claim he was defending himself and that one of the victims grabbed the bottle and hit him with it. Wayne did not tell Fletcher that Caldwell hit him with the bottle. Fletcher said that about a month passed between when Wayne described killing the victims and when he told law enforcement about what Wayne said.

Fletcher stated that he did not know Wayne prior to sharing a cell pod with him, and he did not know the victims. Fletcher said that Wayne did not say whether Andrews removed his sweater prior to their fight. The state rested. Wayne exercised his right to remain silent and elected not to testify in his own defense. The defense rested.

On October 30, 2021, the jury returned a verdict of guilty as charged on both counts. The jury was not polled. The trial court ordered that a presentence investigation report be prepared.

On December 7, 2021, a sentencing hearing was held. Wayne filed a motion for a new trial and a motion for a post-verdict judgment of acquittal.

21

Wayne waived any sentencing delays, and the trial court denied both motions. The trial court sentenced Wayne to life imprisonment at hard labor without benefits on both counts, to be served consecutively. The trial court listed several factors from La. C. Cr. P. art. 894.1 and said that giving Wayne concurrent sentences did not account for the fact that there were two lives lost in this matter. The trial court said that if it sentenced Wayne to life imprisonment for one young man's death the other victim "has no real sentence…because it's concurrent with the other one." Wayne received credit for time served and was advised of his post-conviction relief time limits. Wayne now appeals.

**DISCUSSION**

Wayne's sole assignment of error is that there was insufficient evidence to support his convictions for second degree murder. Wayne argues that he lacked the specific intent to kill Andrews, which can be seen by the fact that he engaged in a fistfight with him instead of immediately killing him. Wayne states that it was only when Caldwell intervened with a threat of lethal force, stating that he was going to knock Wayne out with a bottle, that he pulled out his gun and shot Caldwell in self-defense. Wayne contends he reasonably believed he was in imminent danger of great bodily harm when Caldwell stood over him and threatened to hit him with a bottle he was holding.

Wayne argues that he may have been the initial aggressor, but Caldwell became the aggressor when his actions exceeded the level of force necessary to defend himself or Andrews from Wayne. Wayne asks this court to reverse his conviction for the second-degree murder of Caldwell.

22

In the alternative, Wayne argues he is guilty of the lesser offense of manslaughter for killing Caldwell, as he was provoked by the threat of being hit with a bottle during the fistfight with Andrews. Wayne asks that this court modify his second-degree murder conviction for killing Caldwell to a conviction for manslaughter.

Lastly, Wayne argues this court should find that he is, at most, guilty of manslaughter for killing Andrews. Wayne contends that he was provoked when Caldwell joined the fistfight, making it two against one, and then threatened him with serious bodily injury. Wayne argues that he did not have the chance to calm down after being attacked by Caldwell and "simply reacted" when he found himself "face to face and within inches of" Andrews. Wayne asks that this court modify his second-degree murder conviction for killing Andrews to a conviction for manslaughter.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Alexander*, 51,918 (La. App. 2 Cir. 4/11/18), 247 So. 3d 981, *writ denied*, 18-0805 (La. 2/11/19), 263 So. 3d 436. The appellate court does not assess the credibility of witnesses or reweigh evidence. *Id.*; *State v. Bass*, 51,411 (La. App. 2 Cir. 6/21/17), 223 So. 3d 1242. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Haley*, 51,256 (La. App. 2 Cir. 5/24/17), 222 So. 3d 153, *writ denied*, 17-1230 (La. 4/27/18), 241 So. 3d 305.

Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he or she saw or heard something. *State v. Alexander, supra*; *State v. Howard*, 49,965 (La. App. 2 Cir. 6/24/15), 169 So. 3d 777, *aff'd*, 15-1404 (La. 5/3/17), 226 So. 3d 419. Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. *Id.* When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove, and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *State v. Robinson*, 47,437 (La. App. 2 Cir. 11/14/12), 106 So. 3d 1028, *writ denied*, 12-2658 (La. 5/17/13), 117 So. 3d 918.

Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Alexander, supra*. The trier of fact is charged with making a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or in part. The reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. *Id.*; *State v. Woodard*, 47,286 (La. App. 2 Cir. 10/3/12), 107 So. 3d 70, *writ denied*, 12-2371 (La. 4/26/13), 112 So. 3d 837.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). The penalty is life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1(B).

24

Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances and the actions of the defendant. *State v. Walker*, 51,217 (La. App. 2 Cir. 5/17/17), 221 So. 3d 951, *writ denied*, 17-1101 (La. 6/1/18), 243 So. 3d 1064. Specific intent can be formed in an instant. *State v. Alexander, supra*; *State v. Washington*, 50,424 (La. App. 2 Cir. 3/16/16), 188 So. 3d 350, *writ denied*, 16-0718 (La. 4/13/17), 218 So. 3d 119.

The discharge of a firearm at close range and aimed at a person is indicative of specific intent to kill or inflict great bodily harm upon that person. *State v. Lloyd*, 48,914 (La. App. 2 Cir. 1/14/15), 161 So. 3d 879, *writ denied*, 15-0307 (La. 11/30/15), 184 So. 3d 33, *cert. denied*, __ U.S. __, 137 S. Ct. 227, 196 L. Ed. 2d 175 (2016). Specific intent to kill may also be inferred from the extent and severity of the victim's injuries and the defendant's use of a deadly weapon to produce those injuries, which involved serious risk of death. *State v. Alexander, supra*. The determination of whether the requisite intent to kill is present is a question for the trier of fact. *State v. Walker, supra*.

Wayne further asserts that he acted in self-defense in killing Caldwell. A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(A). The possibility of retreat may not be considered as a factor in determining whether or not the defendant had a

25

reasonable belief that deadly force was reasonable and apparently necessary. La. R.S. 14:20(D).

When the defendant claims self-defense, the state has the burden to prove beyond a reasonable doubt that the homicide was not committed in self-defense. *State v. Alexander, supra*; *State v. Edwards*, 49,635 (La. App. 2 Cir. 2/26/15), 162 So. 3d 512, *writ denied*, 15-0628 (La. 2/5/16), 186 So. 3d 1163. When a defendant claiming self-defense challenges the sufficiency of the evidence on appeal, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. *Id.*

Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Alexander, supra*; *State v. Jones*, 48,458 (La. App. 2 Cir. 11/20/13), 128 So. 3d 593, *writ denied*, 13-2926 (La. 5/30/14), 140 So. 3d 1173. The use of deadly force against an unarmed victim, even in the midst of a physical altercation, may be an excessive use of force. *State v. Edwards, supra*.

A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. La. R.S. 14:21; *State v. Edwards, supra*. If the aggressor's withdrawal is not made sufficiently known to his adversary, he is not eligible to claim the justification of self-

26

defense for the homicide. *Id.* Furthermore, it is justifiable to use force or violence or to kill in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person. La. R.S. 14:22.

Witnesses testified that Kayla felt Andrews had disrespected her and she was furious about it. Phone records show that Kayla spoke with Wayne for about three minutes soon after she left her friends' dorm room. Kayla testified that she then called her sister and spoke with her for about 30 minutes, telling her about her interaction with Andrews. Wayne was present for much of that conversation, so Kayla thereby informed Wayne that Andrews had been disrespectful to her, providing a motive for Wayne to find Andrews. Kayla testified that he left her dorm room while she was still on the phone with her sister.

Teyan testified that she saw Wayne that night just before the shooting with a fanny pack that he always wore on him and that he looked very angry. Alexys testified that she and Andrews were leaving Bowen Hall and were separated from their group of friends when Wayne found them and began fighting with Andrews. Wayne got Andrews on the ground and was hitting him when Caldwell stepped in to help his friend. Wayne was the aggressor in his altercation with Andrews. Clemons stated that he heard Caldwell say he was going to hit Wayne with a bottle, but Caldwell never did so. Alexys testified that Wayne got out a gun and fired two shots at Caldwell and a third shot at Andrews, who was standing there in shock after Wayne shot Caldwell.

27

Alijah testified that she saw Wayne and Kayla walking toward Bowen Hall after Kayla's altercation with Andrews. Alijah was sitting in her car during the shooting and described hearing three gunshots, the first two one right after the other, but that there was a pause between the second and third shots. Fletcher's testimony was consistent with other witnesses' testimony regarding Wayne's altercation with Andrews and Caldwell and his shooting them. Fletcher also testified that Wayne said he intended to claim self-defense because there was a bottle nearby and he could claim that Andrews or Caldwell grabbed the bottle and hit him with it.

Dr. Peretti testified that there was no way of knowing where Caldwell was standing in relation to Wayne when Wayne shot him, and that both victims died from gunshot wounds to the chest. Witnesses testified that Wayne was getting the better of Andrews. There was no evidence presented that Caldwell used a bottle as a weapon or attempted to use a bottle as a weapon. There was no evidence presented showing that Wayne felt threatened or in fear of any harm, but rather he told Fletcher he was "irritated" by Caldwell's attempt to help his friend. Caldwell would have been justified in hitting Wayne with the bottle, because it was justifiable for Andrews to have done so in that situation. See La. R.S. 14:22. Testimony demonstrates that Caldwell first attempted to pull Wayne off Andrews without success, so if he had used a bottle against Wayne, he would have been justified. Fletcher also did not testify that Wayne said to him he had been hit in the head during the altercation.

It is clear from the testimony that Wayne had the specific intent to kill Caldwell and Andrews and the jury was reasonable in concluding the same. The evidence is sufficient and supports Wayne's convictions.

Defendant's assignment of error lacks merit and his conviction and sentence are affirmed.

## CONCLUSION

For the foregoing reasons, defendant's convictions and sentences are affirmed.

**AFFIRMED.**