Judgment rendered December 17, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,640-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

MARK DEWAYNE KELLY                          Appellant

* * * * *

Appealed from the
Second Judicial District Court for the
Parish of Jackson, Louisiana
Trial Court No. 53,100

Honorable William R. "Rick" Warren, Judge

* * * * *

DMITRC I. BURNES                            Counsel for Appellant

MARK DEWAYNE KELLY                          Pro Se

DANIEL W. NEWELL                            Counsel for Appellee
District Attorney

DARRELL R. AVERY
PERRIN N. SMITH, JR.
Assistant District Attorneys

* * * * *

Before STONE, COX, and HUNTER, JJ.

**COX, J.**

This criminal matter arises from the Second Judicial District Court, Jackson Parish, Louisiana. Defendant, Mark Kelly ("Kelly"), was indicted by a grand jury for the second degree murder of Marcus Foster ("Foster") in violation of La. R.S. 14:30.1. Following a unanimous jury verdict, Kelly was sentenced to life imprisonment without benefits. For the following reasons, Kelly's conviction and sentence are affirmed.

## FACTS

On July 7, 2023, officers from Jackson Parish Sheriff's Office ("JPSO") were dispatched to 1879 Gladway Road following a report that a man shot his son. Officers identified Kelly as the shooter and discovered that the victim, Foster, who lived with Kelly, had been shot in the head. Following an interview with Kelly, he was subsequently arrested, and a bill of indictment was filed against Kelly on August 30, 2023. The following pertinent testimony was presented at trial:

First, Deputy Alex Blundell ("Deputy Blundell"),[1] of JPSO, the arresting officer in this case, testified that after he placed Kelly in handcuffs, he entered the home and saw a gun on a chair in the kitchen, and Foster's body on the floor. Deputy Blundell stated that no one else was present in the home during the time he arrived until the other officers secured the scene. Deputy Blundell testified that he also assisted in collecting evidence, which, in addition to the gun he noticed earlier, included a reveal game camera and "two live and four spent" shell casings. Deputy Blundell stated he also looked for physical signs of abuse on Kelly's body but did not notice any

---

[1] Deputy Jarrett Rogers ("Deputy Rogers") also testified that on July 7, 2023, he was dispatched to 1879 Gladway Road after he received a call that a man had shot his son. Deputy Rogers identified Kelly in open court and stated that he had been to Kelly's home before because of an issue Kelly had with Foster.

marks or blood, which would have led him to believe that Kelly was the victim of domestic abuse.

Deputy Chris Tippen ("Deputy Tippen") also testified he was dispatched to the scene. Deputy Tippen explained that he was the first officer to enter the Kelly residence and observed Foster's body on the floor and a revolver lying on a chair. Deputy Tippen stated that he also found a cellphone outside of the residence and discovered the person on the line was Kelly's brother.

Next, Investigator Terry Brister ("Inv. Brister") confirmed warrants were issued for two cellphones, one belonging to Foster, and the other to Kelly, as well as game cameras located about the property, and a .44 revolver pistol. He stated that while there were cameras in the home, some of them were inoperable, so nothing could be collected from them. Inv. Brister stated, however, that he was able to retrieve photographs from some of the other cameras. He explained that the cameras are motion-activated and store photographs of activity on SD cards, which is how he was able to retrieve photographs of the incident as it happened.

Inv. Brister stated that he also took pictures of the scene and Kelly, noting that he did not observe any injuries on Kelly's person. Thereafter, the State introduced the photographs from the cameras in Kelly's home, in which Inv. Brister explained that Kelly could be seen in the hallway toward the kitchen holding a gun in his right hand. He stated that Kelly could later be seen with blood on his left arm that could have come from bullet fragments after the gun was fired or from a previous altercation.

Investigator Donovan Shultz ("Inv. Shultz"), the chief investigator for JPSO, testified that he was dispatched to Kelly's residence and, upon arrival,

2

sought a search warrant for the property and secured the area. Inv. Shultz explained that he recovered Foster's and Kelly's cell phones as well as deer cameras located throughout the residence. The State entered photographs taken at Kelly's residence, and Inv. Shultz identified that the gun recovered was a semi-automatic and noted that four bullets had been fired and that two live rounds still remained in the gun. Inv. Shultz further identified a photograph which showed Kelly's person; Inv. Shultz explained that he did not see any injuries or marks on Kelly's body, which would have led him to believe that Kelly had been knocked down. He further explained that he did not see any signs of hand marks around Kelly's neck which would lead him to believe Kelly had been choked. Inv. Shultz admitted, however, that he did notice redness, but compared it to a sunburn.

Inv. Shultz then stated that during his interview with Kelly, he was told that Kelly tried to call the police on other occasions to have Foster removed from his home, but nothing was ever done. Inv. Shultz stated that he checked for any domestic complaints that Kelly filed but did not find anything concerning Kelly and Foster. Inv. Shultz stated that the only domestic complaint he found concerning Kelly was one filed by Foster's mother against Kelly. Inv. Shultz then identified a video Foster took moments before the shooting occurred. Inv. Shultz explained that from the video, smoke could be seen coming from the gun that was fired.

On cross-examination, Inv. Shultz stated that Foster could not be seen pushing or choking Kelly on the video Foster took. He stated that Kelly could be seen walking from his bedroom with a gun and pointing it at Foster. Inv. Shultz admitted that the video Foster took did not start until Kelly went into his bedroom. He further explained that from the video, it appeared as

3

though Foster was toward the living room area, and when he turned around, Kelly could be seen with a gun in his hand. Inv. Shultz also stated that at no point did Kelly deny being the person who shot Foster, and that Kelly maintained that he only did so out of self-defense because Foster grabbed him around the neck and pushed him down a couple of times.

Next, Norma Barker ("Barker"), one of Foster's friends, identified Kelly in open court and testified that the week before Foster was killed, she helped him move into Kelly's home. Barker stated that she also spoke with Foster the day he was killed, and during that conversation, she could hear Foster and Kelly arguing. Barker stated that during the argument, Foster told her that Kelly threatened to shoot him. She stated that at some point during the call, the call was cut off, and she was unable to reach Foster again after that call.

Next, Dr. Frank Peretti ("Dr. Peretti"), an expert in the field of forensic pathology, testified he performed Foster's autopsy and concluded that the cause of death was a single gunshot wound. In describing the wound path, Dr. Peretti stated that the bullet entered the left side of Foster's face and exited through the lower right side of his neck, with its trajectory going from left to right in a downward direction. Dr. Peretti noted there was stippling on the skin, which indicated that the gun was fired at close range, and that it was a typical gunshot path, meaning that the barrel was straight at the time the gun was fired, so that likely there was no struggle. Dr. Peretti testified that he performed a toxicology test and found methamphetamine and metabolite amphetamine in Foster's system, which he would have taken within the 24 hours before the shooting occurred.

4

Thereafter, the State rested, and Kelly's trial counsel presented the following witnesses:

First, Joshua Stephens ("Stephens") testified that he worked with Kelly for several years and that he had witnessed several negative interactions between Kelly and Foster. Stephens explained that on one occasion, he went to help fix a toilet at Foster's mother's home, when Foster got upset and took his frustration out on Kelly. Stephens stated that the argument appeared as if it would become physical, so he intervened. Stephens testified that Foster was more aggressive when he used drugs and described Foster as a "loose cannon." On cross-examination, Stephens clarified that he was not paid to testify for Kelly.

Next, Michael McDannell ("McDannell") testified that he also worked for Kelly and knew Foster as well. McDannell stated that he had been around Foster long enough to tell when he was under the influence, and that when he was, Foster was an entirely different person. McDannell testified that he witnessed altercations between Foster and Kelly before, and that during one altercation in which he went to help Kelly retrieve a boat, Foster drove by, upset that Kelly was taking the boat, and pulled a gun on Kelly and stated, "Just blink and I'll end you here." On cross-examination, McDannell clarified that he was not present when Foster was shot.

Michael Copeland ("Copeland") then testified that he previously worked for Kelly. Copeland stated that he also knew Foster and was aware that Foster used meth. Copeland testified that he once witnessed Foster push Kelly while they were working. On cross-examination, Copeland admitted that this incident occurred approximately five years before the shooting.

5

Finally, Beau Richey ("Richey") testified that he also worked for Kelly and witnessed Foster physically attacking Kelly. He explained that while working on a job, he heard arguing, and when he went to see what happened, he saw Foster with his hands around Kelly's neck. Richey stated that Kelly used his hammer to hit Foster on the arm to make him let go and then Foster left. Richey also identified another time in which Kelly did not want to give Foster any money, and Foster grabbed Kelly's hand and throat but eventually let go. Richey testified that he knew Foster had used meth, and when he did, Foster became unpredictable.

At the close of testimony, the jury unanimously found Kelly guilty as charged. Sentencing occurred on November 12, 2024, wherein Kelly was sentenced to life imprisonment without benefits.

## DISCUSSION

**Sufficiency of the Evidence**

On appeal, appellate counsel argues that the verdict returned was contrary to the evidence presented at trial. Specifically, appellate counsel argues that the State failed to prove he was not justified in shooting Foster because testimony established that Foster had a history of violence and aggression toward Kelly, especially while under the influence of meth, which Dr. Peretti testified was present in Foster's system at the time of the shooting. Appellate counsel asserts that Foster's violent behavior toward Kelly, coupled with Foster being six feet tall and weighing 286 pounds, showed that Kelly was justified in shooting Foster to protect himself.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential

6

elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Grimble*, 51,446 (La. App. 2 Cir. 7/5/17), 224 So. 3d 498. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So. 3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Eason*, 43,788 (La. App. 2 Cir. 2/25/09), 3 So. 3d 685, *writ denied*, 09-0725 (La. 12/11/09), 23 So. 3d 913.

Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Alexander*, 51,918 (La. App. 2 Cir. 4/11/18), 247 So. 3d 981, *writ denied*, 18-0805 (La. 2/11/19), 263 So. 3d 436. The trier of fact is charged with making a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or in part. The reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. *Id*.

The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by

viewing that evidence in the light most favorable to the prosecution.  When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational trier of fact to conclude, beyond a reasonable doubt, that the defendant was guilty of every essential element of the crime.  *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Hampton*, 52,403 (La. App. 2 Cir. 11/14/18), 261 So. 3d 993, *writ denied*, 19-0287 (La. 4/29/19), 268 So. 3d 1029.  Circumstantial evidence is defined as evidence of facts or circumstances from which one might infer or conclude the existence of other connected facts.  *Hampton, supra*.  Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something.  Circumstantial evidence provides proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.  *State v. Lilly*, 468 So. 2d 1154 (La. 1985); *Hampton, supra*.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm.  La. R.S. 14:30.1(A)(1).  Justifiable homicide is defined by La. R.S. 14:20, which provides, in pertinent part:

A. A homicide is justifiable:

(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger

8

to his own life or person if he attempted to prevent the felony without the killing.

\* \* \*

C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force.

D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm or to prevent the unlawful entry.

When a defendant claims justifiable homicide by an act in self-defense, the State has the burden of proving beyond a reasonable doubt that the homicide was not committed in self-defense. La. C. Cr. P. art. 390. Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. McGill*, 52,600 (La. App. 2 Cir. 4/10/19), 268 So. 3d 346; *State v. Johnson*, 41,428 (La. App. 2 Cir. 9/27/06), 940 So. 2d 711, *writ denied*, 06-2615 (La. 5/18/07), 957 So. 2d 150. Although there is no unqualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. *State v. Johnson*, *supra*.

When a defendant challenges the sufficiency of the evidence in a self-defense case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense or in the defense of other. *State v. McGill*, *supra*.

9

In this case, as appellate counsel notes, several witnesses testified to Foster's past behavior of aggression and physical violence toward Kelly, which often concerned money or issues related to work. Witnesses also testified that Foster used drugs, primarily methamphetamine, and that when under the influence, Foster was considerably more combative toward others, especially Kelly. Appellate counsel asserts these past incidents were cause for Kelly to reasonably believe he was in imminent danger and, therefore, Kelly was justified in shooting Foster. However, none of these witnesses could testify that Foster, on the night of the shooting, had been physically aggressive or violent toward Kelly to justify Kelly's actions.

Moreover, as gleaned from the record before this Court, Kelly, despite knowing his son had a history of attacking or being aggressive toward him, and claims that he had to call the police on several occasions to remove Foster, nevertheless permitted Foster to move into his home a week before the shooting occurred. In the moments leading up to the shooting, an argument ensued, and Kelly was able to walk away, go into his bedroom, retrieve his gun, return to the area where Foster was, and then fire four shots at his son. Appellate counsel asserts that before the shooting, Foster grabbed Kelly's neck and pushed him down a couple of times; however, as testified at trial, pictures of Kelly taken after the incident did not show Kelly had any markings resembling fingerprints on his neck or any other defensive wounds on his body.

While Kelly had no duty to retreat, especially in his own home, the possibility of escape is a factor to be considered, and in this case, Kelly, despite being pushed or choked, was able to walk away from Foster. There was no testimony that Foster charged after Kelly at that time or that he made

10

threats to shoot or otherwise continued to harm Kelly, which would have caused Kelly to believe he needed a weapon to defend himself. Rather, the testimony presented showed that Kelly threatened to shoot Foster, left the area, and when he returned, fired four shots at Foster, who was unarmed. Moreover, in describing the bullet trajectory of the shot that killed Foster, Dr. Peretti testified that the gun was fired at close range, and notably, that the path was typical, meaning that the barrel was straight at the time the gun was fired, so that likely there was no struggle.

Accordingly, we find that the testimony and evidence presented to the jury support a finding that Kelly did not act in self-defense. The jury in this case did not render a verdict against the evidence presented; it simply rejected Kelly's claim that his actions were justified and determined that the State met its burden. We find no error in this conclusion. Therefore, we find that this assignment of error lacks merit.

**Motion for Continuance**

Appellate counsel further argues that the trial court erred in denying Kelly's motion for continuance. Specifically, counsel argues that prior to the start of the trial, a motion to continue was requested for Kelly to obtain additional counsel. Kelly alleged that he was unhappy with trial counsel, in part, because counsel would not obtain phone records in which Kelly stated he called the police on at least four different occasions to address Foster's behavior. Appellate counsel argues that Kelly had no choice but to proceed with his trial counsel despite voicing concerns with his current representation.

Appellate counsel acknowledges that granting the continuance would have caused some inconvenience to the court but argues that such a delay

11

"pales in comparison to the life sentence [Kelly] was facing." Therefore, the failure to ensure Kelly had assistance of counsel violated Kelly's rights under the Sixth and Fourteenth Amendments.

Upon a written motion at any time and after a contradictory hearing, the trial court may grant a continuance, but only upon a showing that such a motion is in the interest of justice. La. C. Cr. P. art. 707; *State v. Butler*, 53,360 (La. App. 2 Cir. 4/22/20), 293 So. 3d 808, 821, *writ denied*, 20-00798 (La. 11/10/20), 303 So. 3d 1039. A trial court has discretion to grant a timely filed motion for continuance in any case if there is ground therefor. La. C. Cr. P. art. 712.

Because the decision to grant or deny a motion for continuance rests within the sound discretion of the trial court, a reviewing court will not disturb the trial court's determination absent a clear abuse of discretion. *State v. Butler, supra*; *State v. Brown*, 52,501 (La. App. 2 Cir. 1/16/19), 264 So. 3d 697, *writ denied*, 19-0297 (La. 6/3/19), 272 So. 3d 892. Generally, a reviewing court will not reverse a conviction even on a showing of an improper denial of a motion for a continuance, absent a showing of specific prejudice. *State v. Snyder*, 98-1078 (La. 4/14/99), 750 So. 2d 832; *State v. Burns*, 56,301 (La. App. 2 Cir. 7/16/25), 416 So. 3d 932.

We first note that no written motion was filed as required by art. 707; instead, trial counsel verbally informed the trial court that Kelly desired to continue the matter to obtain new counsel. Regardless, we find no abuse of the trial court's discretion in denying the continuance. As reflected in the record, trial counsel stated he became aware that Kelly wanted new counsel a month prior to trial and took no issue with new or additional counsel being retained; however, representation was not retained. Trial counsel stated that

12

he was prepared for trial and had several years of experience in similar criminal matters and could adequately represent Kelly.

Moreover, the trial court also spoke with Kelly regarding the motion and noted that Kelly had several months to retain new counsel yet waited until the day of trial to bring this issue before the court. Given this, we cannot say that the trial court abused its discretion in denying the motion to continue. Accordingly, this assignment of error lacks merit.

**Verdict Form**

Finally, appellate counsel argues that Kelly's conviction and sentence should be reversed and vacated because the jury did not return a valid verdict in accordance with the trial court's jury instructions. Specifically, counsel argues that the trial court instructed the jury as follows:

> The verdicts that may be found in this case: one, guilty as charged; or, two, guilty of manslaughter; or three, guilty of negligent homicide; or four, not guilty.

Appellate counsel argues that while the first sheet of the written instructions to the jury complied with the trial court's verbal instructions and La. C. Cr. P. art. 814, the jury only returned the verdict as follows:

"We, the jury, find the defendant 2nd degree murder."

Appellant counsel asserts that in accordance with the explicit instructions of art. 814(A)(3), the jury was required to provide "guilty as charged," and the failure to do so rendered the verdict invalid.

La. C. Cr. P. art. 810, in pertinent part, provides that "When a verdict has been agreed upon, the foreman shall write the verdict on the back of the list of responsive verdicts given to the jury and shall sign it. *There shall be no formal requirement as to the language of the verdict except that it shall clearly convey the intention of the jury*." (Emphasis added).

13

The jury's verdict was read aloud on the record, in which the following was stated, "We the jury find the defendant guilty as charged, second degree murder[.]" Not only did the trial court confirm this was the jury's verdict, but no objections were made during that time as to the verdict form. The jury's intent was clearly conveyed in this matter, which is all that is required.

Therefore, this assignment of error lacks merit.

**Pro Se Assignments of Error**

In addition to appellate counsel's arguments on appeal, Kelly has also presented his own assignments of error for this Court's review.

In brief, Kelly primarily argues his conviction and sentence should be reversed and vacated because the evidence presented at trial was insufficient to show that he did not act in self-defense, and that trial counsel, both prior to and after trial, was ineffective. Specifically, Kelly argues that trial counsel failed to present any evidence to establish that he acted in self-defense on the day of the shooting; namely, video from the cameras located in his home which captured his actions and Foster' statements before the shooting occurred and phone calls in which Kelly claimed he had to call the police on several occasions in an attempt to remove Foster.

In essence, Kelly's arguments are claims for ineffective assistance of counsel. As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief in the trial court rather than by appeal. This is because post-conviction relief creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. However, when the record is sufficient, an appellate court may resolve this issue on direct appeal in the interest of judicial economy. *State v. Nixon,*

14

51,319 (La. App. 2 Cir. 5/19/17), 222 So. 3d 123, *writ denied*, 17-0966 (La. 4/27/18), 239 So. 3d 836.

The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by U.S. Constitutional Amendment VI. Under the standard set out in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed. 2d 674 (1984), and adopted by the Louisiana Supreme Court in *State v. Washington*, 491 So. 2d 1337 (La. 1986), a conviction must be reversed if the petitioner proves (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's inadequate performance prejudiced the defendant to the extent that the trial was rendered unfair and the verdict suspect. *State v. Legrand*, 02-1462 (La. 12/3/03), 864 So. 2d 89, *cert. denied*, 544 U.S. 947, 125 S. Ct. 1692, 161 L.Ed. 2d 523 (2005); *State (City of Ruston) v. Campos*, 51,447 (La. App. 2 Cir. 6/21/17), 224 So. 3d 480.

A deficient performance is established by showing that the attorney's actions fell below the standard of reasonableness and competency required for attorneys in criminal cases and is evaluated from the attorney's perspective at the time of the occurrence. *Strickland v. Washington, supra*. A reviewing court must give great deference to the trial counsel's judgment, tactical decisions, and trial strategy, strongly presuming he has exercised reasonable professional judgment. *State v. Nixon, supra*. A defendant making a claim of ineffective assistance of counsel must identify certain acts or omissions by counsel which led to the claim; general statements and conclusory charges will not suffice. *Strickland v. Washington, supra*; *State v. Nixon, supra*.

15

Although Kelly argues that trial counsel failed to present evidence of the times in which he called the police concerning Foster, Inv. Shultz testified that he did not find any domestic complaints Kelly filed against Foster, only the domestic complaint Foster's mother filed against Kelly. Therefore, we cannot say trial counsel was deficient in failing to obtain records that do not appear to have been on file.

Kelly also argues that trial counsel failed to introduce the video from the cameras in his home so the jury could see what Kelly did before the shooting occurred and hear Foster's statements during that time. We note that stills from the camera video were introduced into evidence, as well as the video Foster took right before the shooting happened. As testified, many of the cameras in Kelly's home were inoperable, so that no photographs could be retrieved. Kelly has presented no evidence that the deer cameras could capture anything other than still photographs, as testified to at trial. We also note that the only other surveillance camera on the property was located outside of the home and could not capture the shooting as it occurred inside.

Kelly has failed to show that his trial counsel was deficient or failed to adequately represent him throughout any stage of these proceedings. We find that Kelly's pro se assignments of error lack merit.

## CONCLUSION

For the foregoing reasons, Kelly's conviction and sentence are affirmed.

**AFFIRMED.**